## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

PROTECTIVE LIFE INSURANCE COMPANY,
               *Plaintiff,*

    v.

CLORINDA D'AGNOLO, LINDA SULLIVAN
AS TRUSTEE OF THE DAVID M. LIPARI
TRUST, SUSAN M. LIPARI AS TRUSTEE OF
THE DAVID M. LIPARI TRUST, MARY A.
LIPARI, CAROL A. LIPARI, JOHN O. LIPARI
and PAUL J. LIPARI,

               *Defendants.*

No. 1:17-cv-1566

### REPLY BRIEF IN SUPPORT OF SUMMARY JUDGMENT MOTION

Linda Sullivan ("Sullivan") and Clorinda D'Agnolo ("D'Agnolo") (collectively, "Movants"), through their respective attorneys, reply in support of their Joint Motion for Summary Judgment and Memorandum (Doc. #57) ("Motion").

## INTRODUCTION

Movants' Motion is a *Celotex*-type motion, arguing that the Lipari Children lack evidence sufficient to establish each of the essential elements of their claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323, 106 S. Ct. 2548, 2552 (1986). The Lipari Children's Response to the Motion (Doc. 59, the "Response") serves only to highlight that lack of evidence. In several instances, the Lipari Children challenge the sufficiency and admissibility of Movants' evidence. As movants, however, it is not their burden to negate the Lipari Children's claims. *Celotex*, 477 U.S. at 423, 106 S. Ct. at 2553.

## INTENTIONAL INTERFERENCE WITH EXPECTANCY
### (First Claim v. D'Agnolo / Third Claim v. Sullivan)

The Motion separately addresses the Lipari Children's claims of intentional interference with expectancy as they relate to David M. Lipari's ("Decedent") personal property, and as they relate to the insurance policies and financial accounts having beneficiary designations.

A.     **Decedent's Assets and Personal Property under the Will**

It is undisputed that the sole beneficiary of Decedent's Will was Decedent's Trust and that the Lipari Children are the Trust beneficiaries. The Lipari Children have not adduced any evidence – *and they do not even allege* – that either Movant interfered with Decedent in a manner that compelled him to change the disposition of his assets under his Will or his Trust. The "bad acts" attributed to Movants pertain to the handling of Decedent's property <u>after</u> he died. Even if proven, those acts cannot constitute intentional interference with expectancy. If the Lipari Children have tort claims arising from those alleged "bad acts," they are claims other than intentional interference with expectancy. Perhaps unwittingly, the Lipari Children acknowledge this in their Response; they argue variously that the "bad acts" constitute breach of fiduciary duty, fraud or conversion, and conclude that however the actions are regarded "they are a tort." (Response, p. 3)

The Lipari Children posit that "Movants incorrectly claim that the counts alleging intentional interference with expectancy cannot proceed because a will contest was not sought" (Response, p. 2), but Movants <u>do not</u> make that claim. The Lipari Children misapprehend the import of Movants' citation to *In re Estate of Roesler*, 287 Ill.App. 3d 1003 (1st Dist. 1997), which holds that a tort action for intentional interference with expectancy is unavailable where a will contest would provide a plaintiff with an adequate remedy. Movants cite *Roesler* solely to underscore that the crux of a claim for intentional interference with expectancy is the wrongful compulsion of a testator to change the disposition of his assets, *i.e.*, by changing his will. The Lipari Children do not allege (and offer no evidence) that Movants did anything to compel Decedent to change his Will or anything else to change the disposition of his personal property. That is the very reason they cannot prevail on a claim for tortious interference with expectancy.

B.    **Decedent's Insurance Policies and Accounts**

The Lipari Children's first argument on this point is that various evidence and arguments cited by Movants are inadmissible under the Illinois Dead Man's Act (the "Act"). (Response, p. 4) As demonstrated in this section, the Act is inapplicable in this lawsuit. The Lipari Children selectively paraphrase the Act and fail to include key provisions. The Act states in pertinent part:

> In the trial of any action <u>in which any party sues or defends as the representative of a deceased person</u> …, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased … or to any event which took place in the presence of the deceased ..." 735 ILCS 5/8-201.

> "Representative" means an executor, administrator, heir or legatee of a deceased person and any guardian or trustee of any such heir or legatee, or a guardian or guardian ad litem for a person under legal disability. *Id.*

The key wording omitted by the Lipari Children is that which limits the Act's application to where a "party sues or defends as the representative of a deceased person." In this case, neither Movants nor the Lipari Children are suing or defending as the representative of a deceased person; they are simply suing and defending as individuals.

In *Farrenkoph v. Holm*, 142 Ill. App. 336, 340 (Ill. App. Ct.), *aff'd.*, 237 Ill. 94, 86 N.E. 702 (1908), as in this case, there was a dispute between beneficiaries of an insurance policy. The court rejected the applicability of the Act[1]:

> We are of the opinion that this contention cannot be sustained. Appellee is not a litigant in any way adverse to the estate… No one is suing or being sued as the representative of the estate of a deceased person. This litigation is between appellants and appellee in their own proper persons, and in relation to money which if they obtained they would acquire as their own property. Therefore the reservation of the statute does not apply. The certificate was made payable to appellee, and the avails would not go to [the] estate. It would go directly to the beneficiary, and in

---

[1]The Dead Man's Act was formerly Ill. Rev. Stat. 1975, ch. 51, par. 2. *See, Kelley v. First State Bank of Princeton*, 81 Ill. App. 3d 402, 415, 401 N.E. 2d 247, 257 (1980).

no event was payable to the deceased or for his benefit, and was not subject to his debts. *Id.* at 340.

As the Act does not apply to this lawsuit, all of the evidence or arguments that the Lipari Children assert should be excluded are, in fact, admissible. Moreover, as shown below, the Motion is supported by the deposition testimony of Marc K. Schwartz ("Schwartz"), Decedent's attorney, who is not a party to this lawsuit.

### 1. No Evidence of Interference

Movants argue that the Lipari Children lack any evidence that Movants interfered with their expectation of being the sole beneficiaries of the Protective Life policy, the Edward Jones Accounts and the Illinois Credit Union Account. The Lipari Children assert, "it is only [Movants'] contention that Decedent instructed them to make the changes [of beneficiary] that supports their position." (Response, p. 5) The Lipari Children ignore the fact that the Motion is a *Celotex* motion; it is their burden to produce evidence establishing the elements of their claims. For that reason, it is insufficient for them to respond by simply pointing out deficiencies in the evidence underlying the Motion, because Movants have no burden to produce evidence negating the Lipari Children's claims.

The Lipari Children offer literally no evidence of the element of interference. They inexplicably assert, "Movants' admissions to filling out the change of beneficiary forms which removed the Trust as a beneficiary of the PLIC policy and Edward Jones Accounts alone establishes their entitlement." (Response, p. 5) This *non sequitur* is simply an attempt to avoid their burden. The mere fact that Movants filled out the beneficiary forms is not evidence of interference. The Lipari Children offer no evidence that those forms did not reflect Decedent's wishes, that filling out the change of beneficiary forms was not pursuant to Decedent's direction, or that Decedent's signature on those forms was invalid, as asserted by Movants. (Motion, p. 5)

4

Although it is not Movants' burden to present evidence on a *Celotex* motion, they are not precluded from doing so – and Movants have presented evidence that negates the claim that they interfered with Decedent's own intentions with respect to beneficiary designations. In addition to Movants' testimony that Decedent wanted their assistance, Decedent also discussed with Schwartz, his attorney, proposed changes to beneficiary designations. On October 5, 2015, Schwartz met with Decedent and talked about changing beneficiary designations, possibly including North American, Protective Life, and Minnesota Life. (Schwartz Tr., pp. 15, 17-18) Decedent asked D'Agnolo to leave the room and then explained to Schwartz "he was actively working on changing certain beneficiary designations and that he had asked for assistance in doing so" from his sister. (Schwartz Tr., p. 68) Decedent also discussed with Schwartz the removal of John Lipari as a beneficiary. (Schwartz Tr., pp. 84-85) Schwartz took contemporaneous notes regarding his conference with Decedent, which are an exhibit to his deposition. (Schwartz Tr., pp. 59, 61) Finally, Schwartz testified that Decedent was "very clear in his conversation" and "very clear in his thoughts" with Schwartz during a 15- to 20-minute visit. (Schwartz Tr., pp. 56-57)

### 2.    No Evidence of Tortious Conduct

The key element on which the Lipari Children focus is tortious conduct, specifically "undue influence," the elements of which are cited on page 5 of the Motion. Movants argue in their Motion that the Lipari Children allege that Decedent was <u>susceptible</u> to undue influence, but they have no evidence that Decedent, in fact, <u>was</u> unduly influenced by Movants to change beneficiaries. The Lipari Children's Response does not address that deficiency in their case.

The sole evidence cited by the Lipari Children on this third element is the purportedly expert opinion of Dr. Esam Dajani ("<u>Dajani</u>") (Declaration of Dr. Esam Dajani. Response, Ex. B)

to establish that Decedent "lacked the mental capacity … to make a knowing disposition" of his property, and that Decedent "was more susceptible to be unduly influenced by the people around him." (Response, p. 6) Movants take exception to the admissibility of Dajani's opinions (discussed extensively below), but even if taken at face value, neither of Dajani's opinions constitute evidence that Decedent's will was overpowered, that his change of beneficiary designations was something he would not otherwise do, that his freedom concerning the disposition of his insurance policy and accounts was destroyed, or that the changes in beneficiary were the will of Sullivan or D'Agnolo, rather than Decedent's. *In re Estate of Hoover*, 155 Ill.2d 402, 411, 615 N.E.2d 736, 740 (1993).

Dajani's Declaration, offered as expert testimony, is subject to Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)[2] requires a court to perform a gatekeeping function; that is, a court must assess the reliability and relevance of the proffered opinion testimony. To be admissible, opinion testimony must be grounded in the "methods and

---

[2]In 2000, Rule 702 was amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and to the many cases applying *Daubert*, including *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999). See, Fed. R. Evid. 702, Advisory Committee Notes.

procedures of science," and must consist of more than simply "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2795; *Winters v. Aurora Foods, Inc.*, No. CIV. 00-405-CJP, 2003 WL 25764893, at *2 (S.D. Ill. Sept. 2, 2003), *aff'd. sub nom. Winters v. Fru-Con Inc.*, 498 F.3d 734 (7th Cir. 2007).

Federal Rule of Evidence 104(a) requires that expert testimony proffered for admission under Rule 702 must be tested to be sure that the person possesses genuine expertise in a field and that the court testimony "adheres to the same standards of intellectual rigor that are demanded in [the expert's] professional work." *Braun v. Lorillard Inc.*, 84 F.3d 230, 234 (7th Cir. 1996). "In all cases, however, the district court must ensure that it is dealing with an expert, not just a hired gun." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) The trial court's focus "must be solely on the "principles and methodology" employed by the expert, not on the ultimate conclusions that they generate." 509 U.S., at 595, 113 S.Ct., at 2797. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997)

Dajani's testimony, as a *pharmacologist*, is offered to prove that Decedent was subjected to undue influence that led him to change beneficiaries. Dajani's Declaration expresses his "pharmacological opinion," but does not include testimony regarding what a pharmacologist is or does, or the subject matters upon which a pharmacologist is qualified to opine. Yet, it is important to understand those things in order to determine if Dr. Dajani's opinion is admissible under Rule 702. For that, Movants look to various authorities:

Pharmacology:

    1: the science of drugs including their origin, composition, pharmacokinetics, therapeutic use, and toxicology;

2: the properties and reactions of drugs especially with relation to their therapeutic value. https://www.merriam-webster.com/dictionary/pharmacology

Pharmacology is the "branch of medicine that deals with the interaction of drugs with the systems and processes of living animals, in particular, the mechanisms of drug action as well as the therapeutic and other uses of the drug." https://www.britannica.com/science/pharmacology

Pharmacology is "the study of how chemical agents affect living processes. These chemical agents include natural substances, such as hormones, neurotransmitters, growth factors, and local autocrine factors, as well as drugs and toxic agents in the environment." *https://medschool.vanderbilt.edu/igp/pharmacology*

The American Society for Clinical Pharmacology and Experimental Therapeutics, of which Dr. Dajani is a member, states, "Pharmacology is the science of how drugs act on biological systems and how the body responds to the drug. The study of pharmacology encompasses the sources, chemical properties, biological effects and therapeutic uses of drugs."
*https://www.aspet.org/aspet/education-careers/about-pharmacology*

Dajani reviewed the medications that were being taken by Decedent, and testified regarding the properties of those drugs and the effect that they would have on someone taking them. (Dajani Decl., ¶¶17-21) As a pharmacologist, Dajani certainly would be qualified to opine on how Decedent *might* respond to those drugs and the effect they *might* have on Decedent. Such an appropriate expert opinion might appropriately support a conclusion that a person lacked the requisite mental competency to execute legal documents, but cannot serve as the sole basis to reach a conclusion on how the drugs *actually* affected him, or any other opinion.

Movants do not dispute Dajani's expertise as a pharmacologist. To the extent he opines that medications taken by Decedent may have affected Decedent's cognitive skills, it would be an appropriate application of his expertise. Dajani's opinions beyond that are not within his specialized knowledge, not based upon sufficient facts or data, and are not the product of reliable principles and methods that have been applied to the facts of the case. In fact, his "opinions" are no more valid than would be those of any layman.

### a. Impaired Cognitive Skills

Dajani's first pharmacological opinion is that Decedent had impaired cognitive skills. (Dajani Decl., ¶¶4 and 14)  His only basis for this conclusion are certain laboratory tests "which *are consistent with, and indicative of*, an impaired and altered mental state."  Given that Dajani never saw Decedent or interviewed a single person, including health care professionals who treated Decedent during his hospitalization at Northwestern Hospital, his conclusion is based on insufficient facts and unreliable principles and methods.

### b. Decedent Was Subject to Being Easily Influenced, Controlled and Directed

In Dajani's *pharmacological* opinion, Decedent "was subject to being easily influenced, controlled and directed by those around him."  (Dajani Decl., ¶¶4, 11, 22 and 23)  Dajani notes that the hospital nursing staff employed a "Confusion Assessment Method" to measure Decedent's level of consciousness and cognitive ability, showing that he was alert on October 6 and 7, 2015. Decedent executed the change of beneficiary documents on October 6.  Dajani further notes that Decedent was lethargic and unresponsive "but the duty nurse was unable to determine whether he was disoriented."  (Dajani Decl., ¶11)  This evidence clearly shows that Decedent was alert and cognizant on October 6, when he executed the documents, and fails to conclude anything different for the next two days.

Dajani notes that the physicians' records disclose that Decedent "had slow mentation, altered mental state and confusion starting from his hospital admission on 10/4/2015," but accounts for the discrepancy with the Confusion Assessment Method as "likely due to the fact that the nurses' assessments were limited to those basic bases of a person's abilities."  (Dajani Decl., ¶12) Dajani is not a medical doctor, nor is he a nurse.  There is no basis for his discounting the testing performed by the nurses.

9

Dajani listened to the recorded conversations between an insurance company and Decedent on October 6, 2015. That is the date Decedent executed change-of-beneficiary forms and the sole date on which he needed to be competent.

Dajani characterizes Sullivan as "feeding and pushing [Decedent] to answer questions." (Dajani Decl., ¶22)  That statement not only is not an expert *pharmacological* opinion, it is a complete mischaracterization of what occurred, which the Court may determine by itself listening to the tapes.  Dajani states that Decedent "could not remember his phone number (630-842-XXXX) that was requested by the insurance company." (Dajani Decl., ¶22)  Dajani completely misunderstands what was occurring: Decedent was asking Sullivan for <u>her</u> telephone number, which is the one she provided (630-842-XXXX), because the insurance company would be calling <u>her</u> back.

Dajani next claims Decedent "showed significant impairment of his memory and cognitive function in these calls," but there is no basis for his *pharmacological* opinion to reach that conclusion. (Dajani Decl., ¶22)  He further opines, based on his *pharmacological* opinion, about "the clearly demonstrated influence of the female voices around him at the time of the calls." (Dajani Decl., ¶22)  Really?

Lastly, Dajani states that Decedent's "alleged signatures on the beneficiary change forms also reflect and are indicative of diminished capacity both mentally and physically."  (Dajani Declaration, ¶22)  He provides absolutely no basis for this conclusion.

        c.    <u>Essential Judgment or Mental Abilities to Execute Documents</u>

Dajani's final pharmacological opinion is that Decedent "lacked the essential judgment or mental abilities to comprehend or understand the effects, reasons or basis for the execution of

'Change of Beneficiary' forms or for formulating or making any other dispositive decisions."

(Dajani Decl., ¶¶4, 11)  Dajani states his *pharmacological* opinion that:

> For the execution of a legal document such as a change of beneficiary, it is essential
> that such individual is alert and has full cognitive functions and can know and
> remember who are the persons they wish to leave their property to, have the mental
> capacity to comprehend the kind and nature of the property in question, and to make
> a knowing disposition of the property according to some plan formed by said
> person.  (Dajani Decl., ¶11)

Dajani does not identify the source of this incorrect standard.  In fact, Decedent was only required

at the time he executed the document to: (1) know the natural objects of his bounty, (2) to

comprehend the kind and character of his property, (3) to understand the nature and effect of his

act, and (4) to make a disposition of his property according to some plan formed in his mind.

*Sloger v. Sloger*, 26 Ill.2d 366, 370, 186 N.E.2d 288, 290 (1962).  Decedent was not required to

be "alert" and have "full cognitive functions," nor was he required to "know and remember who

are the persons" to which he wished to leave his property.

Based on an incorrect standard, without any citation, Dajani opines to a reasonable degree

of *pharmacological* certainty that Decedent lacked these abilities and capacity.  (Dajani Decl.,

¶11) A pharmacologist has no medical qualifications or expertise to render an opinion on

Decedent's mental status.  The fact that Dajani applied the wrong standard for competency further

undermines his conclusion.

d.    Dajani's Opinion Must Be Disregarded

The "expert" opinion offered by Dajani completely fails to meet the standards required by

Rule 702 and must be disregarded.  At best, Dajani, as a pharmacologist, is qualified to opine on

the potential effects of the drugs being administered to Decedent.  Even Dajani's opinions with

respect to the drugs taken by Decedent were inconclusive.  He listed several benzodiazepines, such

as lorazepam and midazolam, which he characterizes as "well-known to impair cognitive functions

in humans." (Dajani Decl., ¶¶19-20) He then notes that Decedent was also administered flumazenil, which is an antagonistic to benzodiazepines, meaning that it may totally reverse the memory impairment induced by benzodiazepines, as well as naloxone, a narcotic-antagonistic drug, both of which would *reverse* the effects of the benzodiazepines and narcotic drugs. (Dajani Decl., ¶¶ 17, 21) In other words, Dajani's own testimony simply tells us that Decedent was taking certain drugs that may be expected to impair his thinking, and other drugs that would be expected to reverse the impairment caused by those drugs. Dajani cannot, and did not, reach a *pharmacological* conclusion that the drugs impaired Decedent to the extent that Decedent did not have the capacity to execute the documents at issue.

Dajani's analysis of the audiotape recordings, Decedent's conversations with Sullivan, the "clearly demonstrated influence of female voices" on Decedent, and Decedent's signatures being "indicative of diminished capacity" all are beyond the scope of pharmacology. Dajani's analysis of these factors is nothing more than a layman's opinion.

The Lipari Children also assert that Decedent's lack of requisite capacity is evidenced by the fact that Sullivan admitted using her Durable Financial Power of Attorney form to effectuate the change of the North American policy. (Response, p. 6) Sullivan's unopposed testimony is that she helped Decedent complete the North American and Protective Life change-of-beneficiary forms on October 6, but Decedent did not sign the North American form on that date because they believed additional information was needed. (Sullivan Tr., p. 93) Sullivan signed it on October 7, 2015, when Decedent was asleep, but dated it October 6 because she thought it was the correct way to do it, because that is the date on which the forms were completed. *Id.* She first saw the power of attorney in the hospital. She neither read, nor had received, a copy of it. (Sullivan Tr., pp. 65, 100, 108-109) Even though Sullivan had no authority to act under the power of attorney

unless Decedent was incompetent, she had no knowledge of that provision, and signed the North American form simply "because I thought I could fill it out as power of attorney." (Sullivan Tr., p. 93)

As stated in the Motion, the Lipari Children have failed to present any <u>evidence</u> that Movants interfered with their expectancy because they have not countered Movants' position that they simply assisted Decedent by filling out change-of-beneficiary forms pursuant to Decedent's direction. (Motion, pp. 4-5) They have also failed on the third element, by failing to show that Movants have committed any tortious conduct. They have only alleged that Decedent's medical conditions made him more susceptible to undue influence; they have not offered any evidence of the five elements of undue influence. (Motion, p. 5)

In sum, the Lipari Children have offered nothing more than an opinion of a pharmacologist that the medications taken by Decedent *may* have affected his cognitive abilities, *if* not counteracted by other medications he was taking. After discounting the remainder of his opinions, for which there is no legitimate basis, the Lipari Children have utterly failed to offer any evidence of undue influence. The only evidence is that Decedent wanted to change his beneficiary forms and asked for assistance in that regard.

### 3. No Damages to Paul or Mary Lipari for the Protective Life Policy

For the purposes of the Motion, Movants acknowledge the Lipari Children's argument that Paul and Mary would be potentially damaged.

### CIVIL CONSPIRACY
### (Fourth Claim – D'Agnolo & Sullivan)

Movants argue that the Fourth Claim contains no allegations of any agreement between Movants or that they worked in combination to accomplish any conspiracy. The Lipari Children's Response simply states that a conspiracy may be established through circumstantial evidence.

Movants do not dispute that contention, but the circumstantial evidence offered by the Lipari Children, being the only evidence of conspiracy, is insufficient to defeat the Motion.

On page 9 of their Response, the Lipari Children identify the circumstantial evidence upon which they rely:

> 1. *"Movants claim they worked together to change Decedent's beneficiaries."*

There is no such evidence in the record. Sullivan testified that she helped Decedent change the North American and Protective Life policies, and talked to him about the Motorola pension, but D'Agnolo was involved in changing other things in which Sullivan was not involved, including Edward Jones and the Illini Credit Union account. (Sullivan Tr., pp. 84, 91, 191-193) Decedent had D'Agnolo handle changes on other things in which Sullivan was not involved. (Sullivan Tr., p. 84) Although Decedent asked both Movants to help him with certain changes, they did not work together and there is no evidence that they did.

> 2. *"Decedent was incapable of requesting Movants' assistance because of his diminished capacity."*

Dajani never stated Decedent was incapable of making requests for assistance, and the Lipari Children have not presented any other evidence to support that statement.

> 3. *"Decedent and Sullivan participated in conversations with Protective Life."*

This is simply evidence that Sullivan assisted Decedent in changing forms related to that policy, not evidence of a conspiracy.

> 4. *"Movants admitted they filled out change-of-beneficiary forms."*

As noted, the unopposed testimony is that they each assisted Decedent with separate tasks and did not work together.

> 5. *"Decedent had financial papers at the hospital and they were not produced in this litigation."* (Response, p. 9)

How this is evidence of a conspiracy, even circumstantially, is a mystery. The dispute is about change-of-beneficiary forms, all of which have been produced.

6.     *"Sullivan will testify to support D'Agnolo's claim to a part of the Protective Life proceeds."*

D'Agnolo's claim to 25% of the million-dollar policy benefits is the essence of the lawsuit and Sullivan's truthful testimony at trial is not evidence of any conspiracy.

Not only do the facts asserted by the Lipari Children fail to show, even circumstantially, that Movants conspired together, it is the *only* evidence offered by the Lipari Children in opposition to the Motion. Although the existence of a conspiracy may be established through circumstantial evidence, the evidence may not be speculative; it must be "must be clear and convincing." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258, 267, 188 Ill.2d 102 (1999).

"Where circumstantial evidence is relied upon to establish the conspiracy…, it is not only necessary that all the circumstances concur to show the existence of such conspiracy and facts sought to be proved, but such circumstantial evidence must be inconsistent with any other rational conclusion." *Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 641 F.2d 457, 463 (7th Cir. 1981). When the plaintiff relies on circumstantial evidence alone, the inference of unlawful agreement must be the compelling, if not exclusive, rational inference. *Pevely Dairy Co. v. United States*, 178 F.2d 363 (8th Cir. 1949). In determining if a conspiracy exists, "[i]f the facts are as consistent with innocent conduct as they are with guilty conduct, then the evidence is neither clear nor convincing." *Chicago Title Ins. Co. v. Sinikovic*, 125 F. Supp. 3d 769, 782 (N.D. Ill. 2015) fn. 7, citing *Lozman v. Putnam*, 884 N.E.2d 756, 774, 379 Ill.App.3d 807 (2008); *Turner v. Hirschbach Motor Lines*, No. 10 CV 50326, 2015 WL 5821097, at *6 (N.D. Ill. Oct. 1, 2015), *aff'd*, 854 F.3d 926 (7th Cir. 2017)

The Lipari Children's circumstantial evidence in opposition to the Motion is highly speculative and hardly "clear and convincing." Moreover, it is not inconsistent with the innocent conduct testified to by Movants. For that reason, even if the facts stated in their Response were deemed to constitute circumstantial evidence, it is insufficient because it is the *only* evidence offered.

## CONVERSION
### (Fifth Claim – D'Agnolo & Sullivan)

The Lipari Children do not challenge Movants' recitation of the four elements that a plaintiff must established to recover on a claim for conversion: (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson*, 184 Ill.2d 109, 114, 703 N.E.2d 67, 70 (1998). In their Motion, Movants argue that the Lipari Children lack evidence of the second and fourth elements.

### A.    No Absolute and Unconditional Right to Immediate Possession

As to the second element, Movants argue that none of the Lipari Children had an absolute and immediate right to possession of Decedent's property because none of them was the executor of Decedent's Will or the trustee of Decedent's Trust. The Lipari Children do not address that fundamental fact in their Response. Instead, they leapfrog directly to the argument that D'Agnolo had a duty and obligation as executor to marshal the assets of Decedent's estate and to deliver the assets to the trustee of the Trust, and then claim "it is undisputed this did not occur." (Response, p. 8) Even if, as the Lipari Children allege, "D'Agnolo has retained possession of Decedent's property, destroyed it or given it away" (Response, p. 9), there can be no claim for conversion

16

without an immediate right to possession. If the Lipari Children have tort claims arising from D'Agnolo's conduct as executor, they are claims other than conversion.

**B.    No Evidence that Defendants Possess Any of Decedent's Property**

The Lipari Children also lack any evidence that either Movant possesses any of Decedent's property; thus, they cannot establish the fourth element. The Lipari Children completely misunderstand the relevance of the Agreement to Terminate in this context. Movants do <u>not</u> contend that the Agreement to Terminate precludes the Lipari Children from pursuing any part of their conversion claim. Rather, the Agreement to Terminate uncontrovertibly establishes that the items of personal property specifically listed and delivered to John Lipari on October 7, 2017 "*constitutes all personal property known by the Administrator at this time to be property of the Estate alleged to be in possession of D'Agnolo and the Sullivan's* [sic]." The Lipari Children have adduced no evidence that there is any other item of Decedent's property they are entitled to, but have not received. Thus, they cannot establish the fourth element of a claim for conversion.

In their Response, the Lipari Children aver that they learned at D'Agnolo's deposition in November 2017, that "she retains personal property that belonged to Decedent… She is now claiming that Decedent orally gave it to her before he died," and that they "have a right under the Agreement [to Terminate] to pursue a claim for that property." (Response, p. 11) The Lipari Children are presumably referring to deposition testimony in which D'Agnolo explained that during his life, Decedent told her that everything he had was hers. For example:

> [Mr. Blumenthal] Q:  I'm talking about his clothes, his dishes, his bed, his furniture, his car, his grill, his tools, his computers, all of his property. Did you ever once ask the children if any of them wanted any of that?
> [Ms. D'Agnolo] A:    Everything that David had he had given to me. There was nothing he didn't have or he had that he hadn't given to me. Did I take care of personal property items when he passed?  Yes I did.

Q:     So do you have the bed that Dave slept in?

A:     No.  I do not.

Q:     What did you do with his bed?

A:     I do not recall.

Q:     What of Dave's property did he give you that you still have?

A:     I do not have Dave's property.  I have my property.

(Dep of D'Agnolo, 296:18-297:16)  Mr. Blumenthal's questioning continued in that vein, asking

D'Agnolo about decedent's bed, dishes, desk, and clothes. With one exception[3], D'Agnolo

remained adamant that during his lifetime, Decedent gave her everything of his.  When pressed

about the whereabouts of a desk:

[Mr. Blumenthal] Q:  Are you saying that's a desk that you owned?

[Ms. D'Agnolo]:  A:  I'm saying that David gave me everything. There was nothing

that he didn't give me.

(Dep of D'Agnolo, 300:7-11)  While the Lipari Children claim they still "have a right under the

Agreement [to Terminate] to pursue a claim for that property", they offer no evidence of *what*

property they are talking about (D'Agnolo's deposition was taken November 6, 2017), and fact

discovery is long closed. As importantly, the Lipari Children offer no evidence to contradict

D'Agnolo's testimony that Decedent gave her everything he owned – a gesture wholly consistent

with a long-term relationship and engagement.

### C.     Conversion Claim Against Sullivan

The Lipari Children do not respond in any way to the arguments raised by Sullivan that are

particular with respect to the conversion claim against her.  As detailed in the Motion, Sullivan

never had possession of any personal property other than the four Pictures and the Lipari Children

---

[3]When asked specifically about Decedent's clothes, D'Agnolo stated "I don't know that I can say they were actually given to me or not.  That's not – we didn't discuss whether he had given me his clothes, no."  (Dep. of D'Agnolo, 300:20-301:24)

offer no evidence otherwise. The Lipari Children have not shown that they, as opposed to the Estate, had any right to the Pictures, nor a right to immediate possession. There is no evidence of a demand and there is no evidence to counter Sullivan's position that D'Agnolo gave the Pictures to Sullivan so that Sullivan could provide descriptive text to the Lipari Children when she ultimately gave the Pictures to them. That is exactly what Sullivan did[4]. The Lipari Children's desperate, transparent attempt to tag Sullivan with some wrongful behavior is completely unsupported by any evidence.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Sixth Claim – D'Agnolo & Sullivan)

Movants and the Lipari Children cite different cases, but there is no dispute about the elements that the Lipari Children must establish to prevail on their claims for intentional infliction of emotional distress: (1) the conduct involved must be truly extreme and outrageous, (2) the actor must either intend to cause inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress, (3) the conduct must *in fact* cause severe emotional distress, and (4) the defendant's conduct must actually and proximately cause the emotional distress. *Schweihs v. Chase Home Fin.*, LLC, 2016 IL 120041, *reh'g denied* (Mar. 27, 2017); *Public Finance Corp. v. Davis*, 66 Ill.2d 85 (1976).

In their Motion, Movants note that conduct alleged by the Lipari Children to constitute intentional infliction of emotional distress falls into three distinct categories: (1) changing of beneficiary forms and interfering with expectancies, (2) denying the Lipari Children access to the hospital and funeral service, and (3) improper actions as executor or trustee. As to each of these three categories, Movants argue that the conduct alleged does not rise to the level of "extreme and

---

[4]The Lipari Children note, "Sullivan recently returned" the Pictures (Response, p. 9, fn. 3); in fact, they were returned in 2016. Motion, Ex. F (Doc. #57-3)

outrageous", and that there is no evidence that the conduct was intended to cause the Lipari Children emotional distress.

Notably, the <u>entirety</u> of the Lipari Children's Response is focused on denial of access to the hospital and funeral service – they offer <u>no</u> response to Movants' arguments concerning the change-of-beneficiary forms and the allegedly improper actions as executor or trustee. Accordingly, this reply brief is limited to the Lipari Children's contention that denial of access to the hospital and funeral service constituted intentional infliction of emotional distress.

## A. <u>The Conduct was Not Extreme and Outrageous</u>

The Lipari Children state that D'Agnolo "admitted" she took steps to prevent them from coming to the hospital and funeral service, after consulting with Decedent's family, because she was informed that John Lipari was attempting to freeze Decedents assets.  That is not disputed – it is *exactly* why D'Agnolo took those steps.

The Lipari Children note three factors to be considered in determining whether conduct is extreme and outrageous.  The first factor is "the relationship between the parties, especially when one of the parties has actual or apparent power or authority over the other party." *Public Finance Corp. v. Davis*, 66 Ill.2d 85 (1986).  The second and third factors are "whether the defendant reasonably believed that his objectives were legitimate and the defendant's awareness that plaintiff was particularly susceptible to emotional distress." *Graham v. Commonwealth Edison Co*., 318 Ill.App.3d 736 (2000).  These three factors are addressed in turn below. None of them supports a finding that D'Agnolo's conduct was extreme and outrageous and, in fact, they illustrate precisely why her conduct was <u>not</u> extreme and outrageous.

As to the first factor:  The Lipari Children offer no facts or evidence about their relationship with D'Agnolo that would give color to this factor – and certainly no evidence that D'Agnolo had

20

any actual or apparent power or authority over them.  Rather, they baselessly conclude that D'Agnolo used her "power and authority as fiancé and Executor" to bar them from the hospital and funeral service.  (Response, p. 12)  Conclusions are not evidence.

As to the second factor:  The Lipari Children observe that "the only objective stated by movants was their desire to prevent a 'circus' atmosphere…" (Response, p. 13)  This is a reference to D'Agnolo's testimony that she made the decision that the Lipari Children would not be welcomed back to the hospital or to the funeral after discussion with Decedent's brother, her own brothers, and several others who were concerned that the service "might become a circus" if Susan Lipari and the Lipari Children showed up.  (Dep. of D'Agnolo, 273:9-274:20)  The Lipari Children seem to complain that this is the "only" objective stated by Movants – but they do not explain why that alone is not enough.  Conspicuously, the Lipari Children do not contest the veracity of D'Agnolo's testimony about her objective, nor do they offer any evidence to establish that D'Agnolo had any different objective.  The Lipari Children aver that Movants "have no evidence to suggest [a circus atmosphere] would have occurred" (Response, p. 13).  That averment improperly shifts the burden on the *Celotex* motion and, perhaps more importantly, completely misapplies the second factor: the standard is whether <u>D'Agnolo</u> reasonably believed her objective was legitimate when she acted (*Graham* at 746), not whether the Lipari Children think so.  The record establishes that D'Agnolo discussed the matter with several people who shared the same concern before making her decision and, therefore, plainly illustrates D'Agnolo's reasonable belief that her objective was legitimate.  The Lipari Children offer no evidence to the contrary.

As to the third factor:   The Lipari Children offer no evidence of "defendant's awareness that plaintiff was particularly susceptible to emotional distress."  *Id.*  They endeavor to do so by claiming D'Agnolo "admitted that decedent and his Children had a loving relationship and that

21

decedent was a devoted and loving father." (Response, p. 12) The Lipari Children cherry-pick fragments of D'Agnolo's testimony to justify that "admission," and completely ignore that Decedent and his children were estranged: he had not seen any of them in 2015, and for months prior to his death was at peace with the fact that he might never see them again. (Dep. of D'Agnolo, 71:2-7, 152:3-8; 174:17-19) But more critically for this *Celotex* motion, that "admission" would reveal nothing more than a healthy and typical father/child relationship. The Lipari Children offer no evidence at all to establish (actually, they do not even allege) that any of them were "particularly susceptible" to emotional distress, or if any of them were, how D'Agnolo would be aware of it.

### B. No Evidence of Intent to Cause Emotional Distress

The Lipari Children correctly note that as plaintiffs they must prove Movants "intended to cause, or recklessly or consciously disregarded the probability of causing" them to suffer emotional distress. (Response, p. 13, citing *Public Finance*) Here again, the Lipari Children offer bold conclusions but no evidence, positing only that "D'Agnolo knowingly retaliated against the [Lipari] Children in an attempt to strike back at them because of their efforts to block Movants from changing beneficiaries… and cause them harm knowing they had a warm and loving relationship with their father." (Response, p. 13) Even if these statements were true, they would not serve as evidence of an intent to cause (or reckless disregard for the probability of causing) emotional distress.

### C. No Evidence of Severe or Extreme Emotional Distress

The Lipari Children correctly acknowledge their burden of proving that they suffered severe or extreme emotional distress (Response, p. 13) and that the Movants' conduct was the proximate cause of that severe emotional distress (Response, p. 14) To support these elements of their claims, each of the Lipari Children offers a declaration purporting to describe the emotional

distress that he or she suffered and the cause of it. Movants do not contest that the Lipari Children each suffered some degree of emotional distress arising from the death of their father. Each of the Lipari Children's declarations is replete with references to ongoing and unresolved hurt, pain and suffering. However, despite the pervasiveness of these emotions, none of the declarations establish *extreme* or *severe* emotional distress beyond that which an ordinary person would be expected to endure upon the loss of a parent.

It is true that medical treatment is not a prerequisite to establishing severe emotional distress (Response, p. 13), but it is probative. Both John Lipari and Carol Lipari <u>do</u> claim in their Declarations that they sought medical care for their emotional distress, but the medical records produced in discovery render any claim of proximate causation dubious at best. John Lipari claims he "*sought counseling from Dr. Kennelly [identified in our 26(a)(1) disclosures* [sic] *and he referred me to Dr. Didenko who put me on anti-depressants.*" John does not attach any medical records to his Declaration and has not produced any in discovery. John was served with interrogatories that asked him if he received "medical, psychiatric or psychological treatment as a result of the intentional infliction of emotional distress" and if so to identify "all providers" and the dates upon which he received treatment. John's answer makes no reference to Dr. Kennelly. John answered only that he saw Dr. Didenko exactly one time, on April 25, 2017, more than 18 months after Decedent's death and the allegedly intentional infliction of emotional distress. (See, John Lipari's Answers to Interrogatories, attached hereto and incorporated herein as **Exhibit 1**)

Carol claims in her Declaration that when her mother told her the children were barred from the funeral, she had chest pains and had to call the paramedics, and that on October 15, 2015 she went to the emergency room with more chest pains. Carol claims in paragraph 13 of her Declaration that "they performed many tests on me and ultimately determined that the 'social

stress' she had suffered caused intense emotional trauma to her." This is simply false. The documents produced in discovery include medical records describing an emergency room visit on October 15, 2015. The "history" section of the emergency room record reveals that Carol presented complaining of "2 days chest pain." The record continues:

**FILED UNDER SEAL**

(See, PLIC – Lipari Production, p. 0879, attached hereto and incorporated herein as **Exhibit 2**) These emergency room records completely belie Carol's characterization of the facts: although Carol reported "increased social stress" (and Movants have no idea what that means), there was no determination that it caused intense emotional trauma to her. Moreover, Carol reported that her family was having financial struggles – but made no mention of being barred from Decedent's funeral.

### D. No Evidence of Proximate Cause

The Lipari Children have not described any facts, circumstances or conditions that establish *severe* or *extreme* emotional distress. More critically, the Lipari Children offer no evidence that they suffered severe emotional distress that was proximately caused by Movants' conduct. It is notable that none of the Lipari Children acknowledges or attributes any sense of distress to the loss of their father – rather they attribute all of it to the acts of Movants. It defies common sense and life experience.

### E. Conversion Claim Against Sullivan

The Lipari Children's purported evidence against Sullivan with respect to their being barred from the hospital and the funeral services is solely that:

24

(a) D'Agnolo talked to Sullivan about the security related to the hospital and the services.

(b) D'Agnolo put in the obituary that interested persons should contact Sullivan.

(c) Even though Sullivan ignored Decedent's wishes not to call the Lipari Children when he was in the hospital, Sullivan was complicit in D'Agnolo's decision not to tell them about the funeral, including John, even though she was active in the funeral arrangements. (*The citations in the Response do not support what is claimed. In fact, Sullivan never refused to give the information to John, she only told him that there would be security that would bar him from the funeral services, and she had zero involvement in planning them*). (Sullivan Tr., pp. 161, 168)

(d) She was aware of conversations between D'Agnolo and D'Agnolo' attorney.

None of this purported evidence shows that Sullivan *did* anything. It shows that D'Agnolo took certain actions and talked to Sullivan, and that Sullivan was aware of what D'Agnolo was doing. Certainly, there is no evidence that Sullivan did anything that would show any intent to inflict emotional distress on the Lipari Children.

WHEREFORE, Movants respectfully request that their motion for summary judgment be granted.

**LINDA SULLIVAN**

/s/ Scott M. Levin
One of her attorneys

Scott M. Levin – ARDC# 6185743
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue, Suite 1100
Chicago, IL 60604-2461
(312) 456-3418
*SLevin@howardandhoward.com*

**CLORINDA D'AGNOLO**

/s/ Daniel A. Wolf
One of her attorneys

Daniel A. Wolf – ARDC# 6202253
Schwartz Wolf & Bernstein
314 N. McHenry Road
Buffalo Grove, IL 60089
(847) 459-4999
*dwolf@swbattorneys.com*

4844-8573-0151, v. 3

**EXHIBIT 1 TO JOINT REPLY BRIEF IN**
**SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

PROTECTIVE LIFE INSURANCE COMPANY,

        Plaintiff,

        v.

CLORINDA D'AGNOLO, LINDA SULLIVAN
AS TRUSTEE OF THE DAVID M. LIPARI
TRUST, SUSAN M. LIPARI AS TRUSTEE OF
THE DAVID M. LIPARI TRUST, MARY A.
LIPARI, PAUL A. LIPARI, JOHN O. LIPARI
and PAUL J. LIPARI,

        Defendants.

**No. 17-cv-1566**

## JOHN LIPARI's ANSWERS TO D'AGNOLO's INTERROGATORIES

NOW COMES Defendant/Cross-Plaintiff JOHN LIPARI, by his attorneys, Milton M.

Blumenthal & Associates, and for his answers to Defendant/Cross-Defendant Clorinda

D'Agnolo's Federal Rule of Civil Procedure 33 Interrogatories states as follows:

1. Describe the emotional distress alleged in your cross-claim for intentional infliction of
   emotional distress, including the specific factors that caused it, the date it began, the
   symptoms you experienced, and your current condition.

   **ANSWER**:

   I will never be able to have closure with the death of my father. Not only was I not told
   about his illness until a day before he passed, but I was only able to see him briefly on
   October 8th, 2105 for a short visit at the hospital where Clorinda never allowed us a
   moment alone. He expressed the desire to speak to or see the other children. However,
   after I left the hospital, I called the hospital room to set up visits and phone calls for the
   other children and I was informed by Clorinda that neither I nor my siblings were
   allowed into the hospital, and that she had given staff our names so that we would be
   refused entry. I had planned to return later that night or the next day.

Even though she claimed that she "loved me" in the hallway of the hospital, she proceeded to ban all the children from the wake and funeral, and instructed the funeral home to withhold information and death certificates. I had to miss work several times to follow up at the local courthouse and hospital to obtain these records which I believe were deliberately withheld longer than necessary.

On top of that she emptied my father's bank account and attempted to change the beneficiaries on at least two insurance policies to effectively write me out of my father's will, a mere 72 hours before he passed. In addition, she tossed out everything in of any value sentimental or otherwise that was in my father's apartment and storage units without notifying the children as the sole beneficiaries of the estate. These actions supported the exact reason my mother requested and obtained a temporary restraining order on the estate assets.

Clorinda has caused me immeasurable pain and distress by inserting herself over the years between my father and his children, intentionally depriving me and my siblings the chance to say goodbye to my father in his last hours, and during his wake and funeral. I do not think I can ever forgive her, as I will never be able to gain the closure that is afforded by final goodbyes.

For Linda's part, she at the very least allowed, cooperated or was influenced by Clorinda to go along with the decisions to ban the children from the hospital, wake and funeral. It is my understanding that Linda actively and knowingly aided and abetted Clorinda in attempting to alter the beneficiaries on my father's life insurance policy, specifically targeting me in addition to banning the children from being able to say their final goodbyes to their father. This perhaps caused more emotional harm than Clorinda's deliberate actions, as I trusted Linda to make decisions in the best interest of our family, the children of her brother. Instead, she went along with whatever Clorinda suggested, not attempting in the least to try to stop Clorinda from controlling every aspect of the final care and funeral arrangements, and therefore is just as culpable for the pain and suffering my siblings and I suffered as we tried to desperately obtain information on the wake and funeral, burial site, and obtaining death certificates. She acted as Clorinda's mouthpiece, communicating to me via text and voice the series of unspeakable actions being taken by Clorinda as they unfolded. When I asked why we would be disallowed from the funeral, she replied that she was honoring Clorinda's wishes, never stopping to consider the effects that her actions would have on her nieces and nephews. Either through negligence or malicious intent, I hold Linda as responsible in the travesties that were perpetrated around the time of my father's death.

2. Did you receive medical, psychiatric or psychological treatment ("treatment") as a result of the intentional infliction of emotional distress alleged in your cross-claim? If your answer is yes, then:

a. Identify all provider(s) from which you received treatment;
b. Identify all date(s) upon which you received treatment;
c. Describe the treatment received, with a separate description for each appointment or treatment;
d. Identify and medications prescribed; and
e. State the amount billed for the treatment.

**ANSWER:**

a. Dr. Didenko, MD
b. Evaluation/prescription: 4/25/17
c. SSRI and anti-anxiety medication
d. Escitalopram and Clonazepam
e. $167.43

3. Identify each component, including the dollar amount, of damages that you claim for intentional/negligent infliction of emotional distress, including:

a. The sum attributable to medical, psychiatric or psychological treatment, with an itemization of the treatment;
b. The sum attributable to any economic damages (other than medical, psychiatric or psychological treatment), and a description of each component of those economic damages; and
c. The sum attributable to non-economic damages and a description of each component of those economic damages.

**ANSWER:**
a. Prescription on 4/24/17: $167.63
b. Over the course of the few weeks after my father's death, I was forced to take time off of work to search out medical records and death certificate that were deliberately withheld by or at the direction of Clorinda. - $1500
c. Intentional/negligent infliction of emotional distress- $200,000

4. Identify each component, including the dollar amount, of the damages that you claim for intentional interference with expectancy, including:

a. a description of any share, fund, asset or thing that you expected to but did not inherit or receive; and
b. the value you ascribe to each such share, fund, asset or thing, and the factual basis for that value.

**ANSWER:**

a. ¼ Protective Life insurance policy, ¼ North American Life. In addition, destruction or transfer of my Father's personal effects on his death without consulting us.

b. Protective Life: $250,000- current value; North American and Minnesota Life insurance policies – $74,333.33 representing my ¼ share of attorney's fees of $297,333.33 to collect on those policies. $26,350.00 as the value of the personal property wrongfully taken and/or disposed of.

5. Identify each component, including the dollar amount, of the damages that you claim for civil conspiracy.

**ANSWER:**

Collusion between D'Agnolo, Sullivan and Marc Schwartz of SW&B to execute last minute changes of beneficiaries to several life insurance policies while my father was not of sound mind and body. Putting forth a document as authentic which my Father denied executing and wrongly asserting that someone other than my Father executed the designation of Beneficiary for the Minnesota Life insurance policy: $500,000.

6. Identify each component, including the dollar amount, of damages that you claim for conversion of personal property, including:

a. A description of each item of personal property that you claim was converted;
b. The factual basis for your claim of ownership or right to possession of each such item;
c. Who interfered with each such item;
d. The factual basis of your claim that the interference was intentional;
e. A description of the damages you suffered as a result of the interference;
f. The current location of each such item; and
g. The value you attribute to each such item and the factual basis for that value.

**ANSWER:**

Clorinda distributed and disposed of items rightfully belonging to my siblings and I

a.   Photo Albums

> Desk
> Couch
> Chairs
> Kitchen table set
> Formal Dining Table and Chairs
> Class Ring

Grandfather's Navy kit
Outdoor Grill
Craftsman tools
All unknown properties of my fathers that I was restricted access to review upon his death

b. All of these items belonged to my father, among other things that we may not know about since his property was gone through and liquidated or given away without any notice to his children.

c. Clorinda and Linda

d. They gave no notice to children prior to emptying his apartment and storage units, and Clorinda even at one point held access to the storage units as a bargaining chip in court negotiations.

e. One of the most salient memories I have of my father's possessions was my grandfather's bag from when he served in the Navy in World War II. That is the most painful, to lose the chance of showing that piece of our history to my children. But I will never fully know how much I have lost, as we have never been told what else was in his apartment or storage unit, as the storage unit was auctioned off.

f. All of these items are most likely donated, liquidated, or obscured in the possession of one of my father's siblings or Clorinda.

g. Photo albums- $10,000 - Sentimentality
Desk- $1500- Solid wooden work desk
Couch- $1000
Kitchen table and chairs: $250
Formal Dining Table and Chairs: $1500
Class ring- $10000- Sentimentality
Grandfather's Navy equipment: $15,000- Sentimentality
Outdoor Grill- $500
Craftsman tools- $500
All unknown properties oif my fathers that I was restricted access to review upon his death- Unknown value

See my answer to Interrogatory #5.

7. With respect to the individual identified as Stephanie Dacuma in Defendants/Counter-Plaintiff's Rule 26(a)(1) Disclosures:

a. What is Stephanie Dacuma's relationship to John Lipari?

b. State the facts and opinions that you believe Stephanie Dacuma will testify to regarding "the effect Counter-Defendants' actions had on John Lipari."

c. Has Stephanie Dacuma made or given any written or oral statements regarding "the effect Counter-Defendants' actions had on John Lipari"? If so, provide a copy of each such statement.

**ANSWER:**

- a. Stephanie is John's girlfriend
- b. Stephanie can attest to the emotional distress experienced by John.
- c. She has not given or made any statements

8. With respect to the individual identified as Roman Dernowski in Defendants/Counter-Plaintiff's Rule 26(a)(1) Disclosures:

a. What is Roman Dernowski's relationship to John Lipari?
b. State the facts and opinions that you believe Roman Dernowski will testify to regarding "the effect Counter-Defendants' actions had on John Lipari."
c. Has Roman Dernowski made or given any written or oral statements regarding "the effect Counter-Defendants' actions had on John Lipari"? If so, provide a copy of each such statement.

**ANSWER:**

a. Roman Dernowski is a coworker at Allstate and employee at my company.

b. Roman can testify to the events around the time around my father's death, the actions of Clorinda in the time after my father's death, and the emotional distress experienced by John.

c. Roman has not given any statements to this effect at this time.

9. With respect to the individual identified as Mary Bown in Defendants/Counter-Plaintiff's Rule 26(a)(1) Disclosures:

a. What is Mary Bown's relationship to John Lipari?

b. State the facts and opinions that you believe Mary Bown will testify to regarding "the effect Counter-Defendants' actions had on John Lipari."

c. Has Mary Bown made or given any written or oral statements regarding "the effect Counter-Defendants' actions had on John Lipari"?

ANSWER:

- a. John's manager at the time of his father's death
- b. Mary can testify to John's emotional distress caused by Clorinda/Linda
- c. Mary has not given any statements at this time

10. Identify each lay witness that you intend to call in support of your claims, and for each person identified state the subjects on which the witness will testify and the specific facts to which the witness will testify.

   **ANSWER:**
   See my complaint and our answers to our FRCP 26(A)(1)(a) Disclosures.


11. Identify each expert witness that you intend to call in support of your claims, and for each such expert witness identify:

   a. the subject matter on which the witness will testify;
   b. the conclusions and opinions of the witness and the bases therefor;
   c. the qualifications of the witness; and
   d. any reports prepared by the witness.

   **ANSWER:**
   Undetermined at this time.

12. Identify each fact that supports your allegation that the Clorinda D'Agnolo, Linda Sullivan and Schwartz Wolf & Bernstein LLP (or any of its attorneys) ("SWB") conspired together as alleged in the Fourth Claim of your Crossclaims, and identify each act taken by D'Agnolo, each act taken by Sullivan, and each act taken by SWB in furtherance of the conspiracy.

   **ANSWER:**

   _1. Clorinda called Marc Schwartz to the hospital, discussed change of beneficiary forms with him, and subsequently attempted to change the life insurance beneficiaries to herself.

   2. Marc called the hospital on Oct. 8th, incorrectly informing Clorinda that I had filed a motion against the estate, precipitating Clorinda's decision to disallow children from hospital and wake and funeral services.

   3. SW&B assisted D'Agnolo and Sullivan in their unfounded efforts to deprive us of our rightful property and put forth a document they knew my father had never executed as being authentic. Further answering see the testimony of each of them.


13. Identify the specific injury you suffered as a result of Linda Sullivan not admitting that her use of the Durable Power of Attorney Form was improper, and describe the damages, including dollar amounts, you sustained as a result until the date of her admission of that fact.

**ANSWER**: I was deprived of the ability to immediately obtain my rightful property and was forced to hire an attorney to fight for it.

    i. $50,000 Mental anguish. I am bewildered that Linda supported Clorinda in her attempt to write me out of the insurance policies and subsequent barring of the children from the hospital and funeral. complicity in Clorinda's actions are intensely hurtful. – $50,000

    ii. $41,666.67 my ¼ share of $166,666.67 Legal expenses to recover funds that were rightfully mine to begin with

14. Identify each person that participated in answering these Interrogatories.

**ANSWER**:

John Lipari

15. Identify each person who has knowledge of the facts alleged in the Crossclaims. For each such person identified, state the factual knowledge held.

**ANSWER**:

   **i.** John Lipari – See allegations made in complaint and responses to FRCP 26(A)(1)(a) disclosures. Further answering, objection is made to this interrogatory as it appears to seek information contained in the mind of another and not this deponent.

   **ii.** Paul Lipari– See allegations made in complaint and responses to FRCP 26(A)(1)(a) disclosures. Further answering, objection is made to this interrogatory as it appears to seek information contained in the mind of another and not this deponent.

   **iii.** Carol Lipari – See allegations made in complaint and responses to FRCP 26(A)(1)(a) disclosures. Further answering, objection is made to this interrogatory as it appears to seek information contained in the mind of another and not this deponent.

   **iv.** Mary Lipari – See allegations made in complaint and responses to FRCP 26(A)(1)(a) disclosures. Further answering, objection is made to this interrogatory as it appears to seek information contained in the mind of another and not this deponent.

   **v.** Susan Lipari -- See allegations made in complaint and responses to FRCP 26(A)(1)(a) disclosures. Further answering, objection is made to this

interrogatory as it appears to seek information contained in the mind of another and not this deponent.

**vi.** All other parties of the ongoing lawsuit.

**vii.** The various individuals identified in the FRCP 26 (A)(1)(a) disclosures.

Dated: 12/19/17

_____

JOHN LIPARI

ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF
Michael L. Blumenthal
Milton M. Blumenthal & Associates
105 W. Madison St.
Suite 1004
Chicago, IL 60602
(312)372-3566
(312)372-3573 fax

**CERTIFICATE OF SERVICE**

December 17,

I, Michael L. Blumenthal, hereby certify that on November 30, 2017, I caused a copy of the foregoing, JOHN LIPARI's ANSWERS TO D'AGNOLO's INTERROGATORIES, to be served

via email and/or first class mail, postage prepaid and depositing same in the U.S. Mail at 105 W. Madison St., Chicago, IL 60602 at or before 5:00 p.m. on and to the following counsel of record:

Daniel A. Wolf
SCHWARTZ WOLF & BERNSTEIN LLP
314 N. McHenry Road
Buffalo Grove, IL 60089
(847) 459-4999
dwolf@swbattorneys.com

Scott Levin
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue, Suite 1100
Chicago, IL 60604-2461
(312) 456-3418
*slevin@howardandhoward.com*

**EXHIBIT 2 TO JOINT REPLY BRIEF IN
<u>SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

# EXHIBIT 2 FILED UNDER SEAL