| | |
|---|---|
| JOHN LIPARI, CAROL LIPARI, MARY LIPARI and PAUL LIPARI,<br><br>   Cross-Claimants,<br><br>  v.<br><br>LINDA SULLIVAN and CLORINDA D'AGNOLO,<br><br>   Cross-Defendants. | No. 17 CV 1566<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Near the end of David M. Lipari's life, his fiancé, Clorinda D'Agnolo, and his sister, Linda Sullivan, oversaw changes to David's estate. If effective, David's children (John, Carol, Mary and Paul) would be entitled to receive less of David's estate and D'Agnolo would be entitled to receive more. D'Agnolo and Sullivan also took steps to prevent Carol, Mary and Paul, from seeing David in the hospital (and took steps to prevent all of the Lipari children from attending his funeral), and allegedly wrongfully retained some of David's personal tangible property. The Lipari children have claims against Sullivan and D'Agnolo for intentional interference with

an expectancy, declaratory judgment, civil conspiracy, conversion and intentional infliction of emotional distress. Sullivan and D'Agnolo move for summary judgment.[1]

## I. Legal Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show that, after "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party," *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), a reasonable jury could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party is also entitled to summary judgment where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[1] This case began as an interpleader action filed by Protective Life Insurance Company, the holder of an insurance policy on David Lipari's life. [1]. Protective Life filed the action to avoid multiple or double liability, [1] ¶ 1, and named as parties those persons whom Protective Life believed had a potential interest in the proceeds of the life insurance policy. *See* [1] ¶¶ 2–11. Jurisdiction was proper under 28 U.S.C. § 1335 (providing original jurisdiction over certain civil actions for interpleader once the plaintiff deposits the disputed proceeds with the registry of the court). Section 1335 requires "only 'minimal diversity,' that is, diversity of citizenship between two or more claimants, without regard to the circumstance that other rival claimants may be co-citizens." *State Farm Fire & Cas. Co. v. Tashire,* 386 U.S. 523, 530 (1967). Such minimal diversity is present here. [8] ¶ 11 (Sullivan is a citizen of Illinois); [10] ¶ 3 (D'Agnolo is a citizen of Arizona); [18] ¶¶ 4–7 (the Lipari children are each citizens of Illinois). Protective Life deposited the policy proceeds with the court, [24], and was dismissed. [13]. The Liparis brought state-law cross-claims against Sullivan and D'Agnolo. [18]. Subject-matter jurisdiction over those claims is based on 28 U.S.C. § 1367.

## II. Facts

David M. Lipari played a central role in the Lipari family. He married Susan Lipari in 1986 and, together, they adopted four children: John, Carol, Mary and Paul. [60] ¶¶ 1–8.[2] David also formed the "David M. Lipari Trust," which named the Lipari children as beneficiaries, [59-1] § 4.01; [60] ¶ 11, and his sister, Linda Sullivan, as trustee. [60] ¶ 12. The trust contained special provisions for Carol, who has muscular dystrophy and receives funding for treatment through both state and federal programs. [60] ¶ 6; [34] ¶ 47; [59-4] ¶ 28; [59-1] §§ 4.01, 9.01(d).

David's trust now plays a central role in this litigation. Under the "David M. Lipari Trust Agreement": (1) proceeds from life insurance policies that named the trust as beneficiary would pay out to a trust estate in part meant to provide for the Lipari children, [59-1] §§ 1.02; 5.02; 6.01; 8.01; 8.05(e); 9.01(a)–(c); (2) the Lipari children could not make unfettered decisions about their share of the trust assets (if any) until reaching the age of thirty-five, *see id.* § 9.05; and (3) David's "tangible

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from cross-claimant the Lipari children's responses to cross-defendant Sullivan and D'Agnolo's Local Rule 56.1 statement, [60], where both the asserted fact and the opposing party's response are set forth in one document. The Lipari children included five additional facts in their Rule 56.1 statement, [60] ¶¶ 32–37, and Sullivan and D'Agnolo did not file a responsive Rule 56.1 statement to indicate whether they dispute those additional facts. These five additional facts are deemed admitted. LR 56.1(b)(3)(C) ("[e]ach party . . . shall serve and file . . . a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon"); LR 56.1(a) ("[a]ll material facts set forth in the statement filed pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party"). I refer to the Liparis by their first names for clarity and brevity.

personal property" was to be divided up into shares of "substantially equal value" and distributed to the Lipari children. *Id.* § 9.01(g).

David and Susan divorced in 2008. [60] ¶ 2. As part of their marriage dissolution proceedings, they were both precluded from making certain changes to their life insurance policies. *See* [57-1] at 3. David was required to maintain the life insurance policies that named a Lipari child as beneficiary until that child had either turned twenty-six or turned twenty-three and graduated from college. *See id.* at 3.

Following the divorce, David started dating (and later moved in with and became engaged to) Clorinda D'Agnolo. [34] ¶ 53; [60] ¶ 10; [57-2] 50:24–51:5; [57-4] 54:3–12. The two were living together in the fall of 2015, when David's health took a rapid turn for the worse. He was diagnosed with cancer in August, [60] ¶ 17, admitted to the hospital on October 2, *id.* ¶ 18, and told his condition was terminal on October 4, 2015. *Id.* ¶ 19. He died on October 9, 2015. [60] ¶ 29. D'Agnolo was appointed independent executor of David's estate. [34] ¶ 136.

He left behind property. At issue here are: (1) the proceeds from a life insurance policy issued by the Protective Life Insurance Company[3] (worth $1,000,000, naming the "David M. Lipari Trust" as its sole beneficiary); (2) the balances of two IRA accounts with Edward Jones (both of which named the "David M. Lipari Trust" as their sole beneficiary, [60] ¶ 16); (3) the balance of one account with the University of

---

[3] Three other life insurance policies play a tangential role; two from the North American Life Insurance Company (each for $250,000, each naming the "David M. Lipari Trust" as their sole beneficiary), and one from the Minnesota Life Insurance Company (for $394,200), [60] ¶¶ 13(a)–(c); 16. The proceeds from these policies are no longer at issue, [60] ¶¶ 13(c), 22, but the changes that were made to them provide circumstantial evidence that is relevant to the parties' dispute about David's other assets.

Illinois Credit Union (which named no beneficiary), [60] ¶¶ 15–16; (4) four paintings and one wood carving, and (5) and a host of David's personal effects (including, for example, cufflinks, a floor lamp, and "[m]iscellaneous yard tools"). [57-1] at 10–13; [57-3].

David's final days were hectic. Adding to the tumult were some last-minute changes to David's assets. On October 6, while David was in the hospital, sometime after John's twenty-sixth birthday, *see* [57-4] 243:12–16, and just three days before David died, Sullivan prepared a change of beneficiary form for the Protective Life insurance policy that (if effective) would have changed the beneficiary from the trust to Mary, Carol, Paul, and D'Agnolo in equal, twenty-five percent shares. [60] ¶ 20; [57-2] 91:15–93:10. In effect, the move would have nullified John's right to receive those proceeds as a trust beneficiary subject to the trust's terms, and instead granted D'Agnolo, Mary, Carol, and Paul the right to receive $250,000, directly and unencumbered, upon David's death.

That same day, Sullivan made the same change to both of the North American insurance policies. [60] ¶¶ 20–21. D'Agnolo prepared change of beneficiary forms for the Edward Jones and University of Illinois accounts. [60] ¶¶ 25, 27.[4] She made

---

[4] There is some disagreement about who actually signed the change-of-beneficiary forms for the Protective Life insurance policy, the Edward Jones accounts, and the Illinois Credit Union account. Sullivan and D'Agnolo say that they prepared the forms and that David signed them. [58] ¶¶ 24, 26 (referring to the Protective Life Insurance form but, in context, appearing to refer to the Edward Jones form), 28. The Lipari children do not admit that David signed any of these forms and admit only that the signature on the form for the Protective Life insurance policy is "purportedly" that of David Lipari. [60] ¶ 24. The Liparis offer no evidence to contest the fact that David signed the forms, so I accept it as true for purposes of the motion for summary judgment.

herself the sole beneficiary of the Edward Jones accounts (replacing the "David M. Lipari Trust"), [60] ¶¶ 16, 25, and the sole beneficiary of the University of Illinois account (replacing no one; prior to the change, the University of Illinois account named no beneficiary). [60] ¶¶ 16, 27. Sullivan and D'Agnolo did not make any changes to the Minnesota Life insurance policy, [60] ¶¶ 35–36, which, the Lipari children say, was an oversight explained by D'Agnolo's mistaken belief that she was already the sole beneficiary of that policy. [60] ¶ 36. *See also* [57-4] 201:23–202:7. All told, the changes (if effective) would have removed from the trust estate more than $1,500,000.

Both Sullivan and D'Agnolo say that each of these changes was in accordance with David's wishes, [57-2] 84:1–24; 118:1–3; 121:14–15; [57-4] 195:22–196:20; 234:11–18, and D'Agnolo says it was at his direction, [57-4] 246:6. But the parties dispute whether David had the mental capacity to make the changes. The Lipari children say he did not. Dr. Esam Dajani, a pharmacologist and professor of medicine at Loyola University-Chicago, reviewed David's medical records after David's death and concluded that, at the time of the changes, David had "impaired cognitive functions," was susceptible to undue influence, "lacked the mental capacity to comprehend the kind and nature" of his property and was unable to "make a knowing disposition" of that property according to his own plans (rather than those of the people around him). [60] ¶ 34; [59-2] ¶¶ 4, 7, 21. Sullivan testified that, while directing the various changes to his estate, David was his normal, lucid self. [57-2]

223:12–16.[5] D'Agnolo testified that, up until October 7, David was "sharp as a tack" and speaking with the "same cadence and the same abilities" that he had prior to falling ill. [57-4] 168:7–10.

The changes to David's estate foretold other dramatic events in the final moments leading up to (and following) his death. On October 8, the day before David died, Sullivan contacted John to tell him that his father was in the hospital and would not live much longer. *See* [34] ¶ 68; [57-2] 115:13–116:2. Sullivan says she did this against David's wishes and out of concern for the Lipari children's well-being. [57-2] 114:8–16; 115:13–116:2; [57-4] 151:6–9; 164:11–15. John, shaken, [59-3] ¶ 6, rushed to the hospital and spent between one and two hours speaking with David before departing. [57-2] 148:17–149:5; [57-4] 172:10–21; [59-3] ¶ 7.

The hour that followed John's departure was maybe the most dramatic of all. David fell asleep and never woke up again. [57-2] 75:1–3; 127:13–15. Ex-wife Susan learned of David's illness (probably through John) and set out to obtain a temporary restraining order freezing David's assets. *See* [57-2] 152:9–16; 156:23–157:10; [59-3] ¶¶ 6, 11. D'Agnolo learned about Susan and John's efforts to freeze David's assets, [57-2] 152:9–16; 155:17–156:10; [57-4] 186:10–14, and told John that neither he nor

---

[5] But Sullivan's conduct is inconsistent with that observation. She says that, when signing the form for the North American insurance policies, she "used" her "durable financial power of attorney," [60] ¶ 21, which only would have been effective if David "lack[ed] sufficient capacity to make or communicate responsible decisions concerning the management of assets." [18-3] at 10; [60] ¶ 21; [34] ¶ 63. Without addressing whether Sullivan properly invoked her powers, the North American Insurance Company apparently decided that Sullivan's power of attorney did not include the power to change beneficiaries, [57-1] at 5, ¶ 10(a), and so ignored the requested change and deposited the proceeds with the David M. Lipari trust. [60] ¶ 22.

any of his siblings would be allowed to speak with David or return to the hospital, [57-4] 175:8–176:13; 185:19–186:22, and that if any of them tried to come back she would ask security to keep them out. [57-2] 183:13–21. She followed through on this threat, instructing the hospital's security team to not allow the Lipari children into David's room. [60] ¶ 37(b); [57-4] 183:17–19.

Things only got messier after David died. The Lipari children requested and were denied information about the location and timing of the funeral service, visitation, burial and the location of the cemetery where he was to be buried. *See* [57-2] 160:10–21; 202:4–8; [57-4] 273:9–13. The children were also told that security guards would be hired to keep the children out of the funeral. [57-4] 273:9-15. Each of the Lipari children submitted declarations documenting the pain and suffering this caused them. [59-3] ¶¶ 19–21, 23–25, 27; [59-4] ¶¶ 9, 11–14, 17–19; [59-5] ¶¶ 9–15; [59-6] ¶¶ 9–13.

David's personal property took a convoluted path of distribution. The record does not paint a complete picture of what, exactly, ended up where (let alone when)[6], but the Lipari children think some of it still is missing. They point to circumstantial evidence suggesting that, because Sullivan and D'Agnolo went to David's apartment after he died and moved some of his belongings, [57-2] 172:18–176:20, and because

---

[6] Some of it was found in David's apartment, later moved to storage, [57-2] 174:10–176:19, and eventually auctioned off. *See* [57-4] 297:19–298:6. Property from David's office at the University of Illinois was thrown away, shredded, or donated. [57-4] 306:23–307:1; 309:1–7. Sullivan took possession of the pictures and wood carvings for a short period of time before giving them to the Lipari children, [60] ¶ 31; [57-2] 177:2–5, except for one painting, which Sullivan kept, *see* [57-2] 197:10–19, pursuant to the Lipari children's indication that she should be allowed to keep it. [57-3] at 3. And John did eventually pick up some of the rest of David's personal effects from D'Agnolo's attorney on October 3, 2017. [57-1] at 24–25.

the Lipari children still do not have some of the property that they believe David possessed at his death, the record "supports an inference that Sullivan has other property" belonging to David. [60] ¶ 31; [57-4] 295:24–305:5; [57-2] 172:18-178:7; [57-1] at 10–15. D'Agnolo says that, to the degree she possesses any property that at one point belonged to David, that property is her property because David gave it to her before he died. [57-4] 297:13–16. And D'Agnolo and Sullivan draw attention to an "Agreement to Terminate" filed in *In the Matter of the Estate of David M. Lipari*, Case No. 15-P-302, Circuit Court of Champaign County, Illinois, that says that "all personal property of [David] known by [D'Agnolo] to be in her possession or control" was returned to Susan Lipari as of August 24, 2017, [57-1] at 20, with a disclaimer that the agreement "does not preclude or bar [Susan Lipari] or the heirs from pursuing any claims they may have arising out of the handling of the Estate by D'Agnolo . . . in any of the previously identified cases pending in the U.S. Federal District Court for the Northern District of Illinois." *Id.* at 19.

Lastly, the parties disagree about David's relationship with his children. Sullivan says that David and his children stopped seeing each other in 2011 or early 2012. [57-2] 37:22–38:8; 41:16–19. D'Agnolo says that David contacted his children at least once a week from 2009 to 2012, [57-4] 61:10–13, saw them on-and-off during that period as well, *see* [57-4] 67:5–69:22, and sent them birthday and Christmas cards until as late as 2015, [57-4] 71:8–11, but had ceased seeing them by the time he died, [57-4] 71:2–7; 276:18–21, and was "at peace" with the idea that he might never see them again. [57-4] 152:3–8. The Lipari children each assert that they had a close,

loving relationship with their father, [59-3] ¶¶ 3–4; [59-4] ¶¶ 3–4; [59-5] ¶¶ 3–4; [59-6] ¶¶ 3–4, and Carol, Mary, and Paul note that they vacationed together with their father and saw him "as much as the distance and his work allowed." [59-4] ¶ 4; [59-5] ¶ 4; [59-6] ¶ 4.

## III. Analysis

### A. Evidence Considered

#### 1. *The Illinois Dead Man's Act*

The Lipari children make an initial appeal to the Illinois Dead Man's Act, aiming to exclude all of Sullivan and D'Agnolo's testimony about their conversations with David. [59] at 4–5. *See also* Fed. R. Evid. 601 ("state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision").[7] The act prohibits any "adverse party or person directly interested in the action" from testifying about conversations with a deceased person in an action "in which any party sues or defends as the representative of a deceased person." 735 ILCS 5/8-201.

Under the statute, a "representative" includes any "executor, administrator, heir or legatee of a deceased person and any guardian or trustee of any such heir or legatee." 735 Ill. Comp. Stat. Ann. 5/8-201. Courts look to the substance of the underlying claims to determine whether a party is suing or being sued "as" a representative, not simply whether they happen to hold a position that might otherwise qualify them as a representative. *See Roberts v. Pierce*, 79 Ill. 378, 381

---

[7] Illinois law applies. *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002) (where there is "no discussion of choice of law issues," the law of the forum state governs).

(1875) (act did not apply where "[i]t was not necessary [that the complainant] should describe himself as administrator in bringing the suit"); *Lasky v. Smith*, 407 Ill. 97, 103 (1950) (act did not apply where "the nature of their respective claims d[id] not bring them within" the act).

D'Agnolo, the executor of David's estate, [34] ¶ 136, and Sullivan, the trustee of the David M. Lipari trust, [60] ¶ 12, say the Act does not apply because neither of them are "suing or defending as the representative of a deceased person; they are simply suing and defending as individuals." [70] at 3. They are correct; both D'Agnolo and Sullivan are being sued for actions they took in their personal capacity. D'Agnolo did not rely on her powers as executrix when making the contested changes, and Sullivan did not rely on her powers as trustee. Neither would be able to pay damages out of David's estate. Both happened to be representatives, but neither are defending "as" representatives.

The children might qualify as "representatives of a deceased person" because they are heirs. *In re Estate of Schlenker*, 209 Ill.2d 456, 462 (2004) (an "heir" is "anyone who would take from a person's estate under the statute of descent and distribution if that person died without leaving a will"). All four children would have been entitled to some portion of David's estate if David had died intestate. *See* 755 Ill. Comp. Stat. Ann. 5/2-1(a) & (b); 755 Ill. Comp. Stat. Ann. 5/2-4 (adopted children are "descendants" so long as they were adopted prior to turning eighteen). *See also* [60] ¶¶ 2, 4–8 (all four children were adopted before turning eighteen). Or, they might

qualify as "legatees," because they are beneficiaries of the trust, and the trust is the sole beneficiary of David's will. [60] ¶ 30.

But like Sullivan and D'Agnolo, the Lipari children are not suing "as" heirs or legatees, either; their tortious interference and conversion claims derive from their right to inherit a portion of David's estate via the David M. Lipari trust, and Sullivan and D'Agnolo did not interfere with their right to take "as heirs"—they (allegedly) interfered with their right to take via that trust, as beneficiaries.[8] Illinois courts draw a distinction between heirs and grantees; the act does not apply where someone who happens to be an heir at law is suing "as grantee." *Hudson v. Hudson*, 237 Ill. 9, 14 (1908); *Grindle v. Grindle*, 240 Ill. 143, 146 (1909). The same distinction applies to beneficiaries of beneficiary certificates. *See Farrenkoph v. Holm,* 142 Ill.App. 336, 340 (2nd Dist. 1908) *aff'd,* 237 Ill. 94 (1908) (beneficiary of "beneficiary certificate" was not suing as a representative); *Sherret v. Royal Clan of the Order of Scottish Clans*, 37 Ill.App. 446, 447 (1st Dist. 1890) ("Mrs. Sherret does not bring this suit as executor, administrator, heir, legatee or devisee of her deceased husband, but simply as the beneficiary named in the certificate by him received from the order").

---

[8] There is one exception. The University of Illinois account named no beneficiary prior to D'Agnolo's preparation of the change of beneficiary form. [60] ¶¶ 14, 27. The trust does not address that money, and it would not have passed through the trust unless a provision in David's will so dictated. Neither party attached a copy of David's will, nor presented any other argument establishing that the money in that account would have ended up with the Lipari children. In the absence of such a showing, the Lipari children have failed to establish that they are suing "as legatees."

The act does not apply because none of the parties are suing or being sued "as" executor, administrator, heir, legatee (or trustee of an heir or legatee) of a deceased person.[9]

### 2.    Dr. Dajani's Report

The parties dispute whether Dr. Esam Dajani's expert report is admissible. Sullivan and D'Agnolo say that a pharmacologist is not qualified to render a medical opinion about an individual's cognitive abilities or a legal opinion about the requisite capacity for executing documents. [70] at 5–13. The Lipari children say only that Dr. Dajani's report is "admissible evidence." [59] at 8–9.

Under Federal Rule of Evidence 702, a qualified expert may testify in the form of an opinion if the expert has specialized knowledge that would be helpful on a material issue, and the testimony is the product of a reliable methodology applied to the facts of the case. The role of the district court is to act as "gatekeeper" when "determin[ing] if the expert opinion is reliable and relevant to the case at hand." *United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999).

Dr. Dajani is a trained pharmacologist. He has a Ph.D. in pharmacology and toxicology from Purdue University and nearly fifty years of experience in the field. [59-2] ¶ 7. He is an adjunct professor of medicine at Loyola University-Chicago and

[9] Even if the act did apply, the result of my analysis would be the same; any conversation between Sullivan or D'Agnolo and David is construed in favor of the Lipari children, *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), and even if I were to exclude those conversations from my consideration entirely, there would still be other evidence that, when considered as a whole, would be sufficient to support the Lipari children's surviving claims.

has conducted gastrointestinal pharmacology and toxicology research at two different laboratories. *Id.* His educational background and experience qualify him to testify as an expert on certain subjects.

David's mental capacity is a fact in issue, and Dr. Dajani's scientific knowledge will assist the trier of fact in understanding some of the evidence relevant to the Lipari children's claims. The Lipari children can support their tortious interference with an expectancy claim by showing that Sullivan and D'Agnolo engaged in "conduct tortious in itself such as fraud, duress or undue influence." *Nemeth v. Banhalmi,* 99 Ill.App.3d 493, 499 (1st Dist. 1981). Their undue influence claim is stronger if they can show that David was susceptible to such influence. *In re Estate of Hoover*, 155 Ill.2d 402, 411 (1993) (the influence "must be of such a nature as to destroy the testator's freedom concerning the disposition of his estate and render his will that of another"); *Gum v. Reep*, 275 Ill. 503, 513 (1916) ("[w]here the mind is wearied and debilitated by long-continued and serious and painful sickness, it is susceptible to undue influence and is liable to be imposed upon by fraud and misrepresentation"); *Schmidt v. Schwear*, 98 Ill.App.3d 336, 342 (5th Dist. 1981). A medical doctor's testimony can help the trier of fact determine how likely it was that undue influence occurred by describing the effect that medication would have had on the deceased's ability to "exercise her will . . . in signing [a] change of beneficiary form." *Prudential Ins. Co. of Am. v. Anderson*, No. 95 C 5322, 1996 WL 734722, at *3–4 (N.D. Ill. Dec. 19, 1996) (doctor's report was sufficient to create genuine issue of material fact where

the doctor's pharmacological analysis of the medications administered contradicted other testimony regarding decedent's mental capacity).

Dr. Dajani reviewed David's medical files before issuing his report. *See* [59-2] ¶¶ 12, 14. His opinion expresses familiarity with the treating physicians' records, [59-2] ¶ 12, several laboratory tests, [59-2] ¶ 14, procedures performed on David, [59-2] ¶ 18, and various drugs administered to David. [59-2] ¶ 17. *See also* [59-2] ¶ 23 ("[t]hese opinions are based on my review of the records identified in my report, and the facts, reports, tests, labs, etc., contained therein"). Sullivan and D'Agnolo argue that portions of the report should be excluded because Dr. Dajani never interviewed anyone, [70] at 9, but there is no requirement that the expert witness have personal knowledge of the subject matter he or she is testifying about. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (testimony admissible "whether bas[ed] . . . upon professional studies or personal experience"); *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006) (noting the commonplace practice of doctors arriving at professional opinions after reviewing medical files).

Other portions of Dr. Dajani's report are either beyond his qualifications or otherwise lacking an adequate foundation. For instance, expert witnesses are not allowed to draw legal conclusions. *W. By & Through Norris v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997). For that reason, I find inadmissible (and disregard) Dr. Dajani's conclusion that David "lacked the essential judgment or mental abilities to comprehend or understand the effects, reasons or basis for the execution of 'Change of Beneficiary' forms," [59-2] ¶ 4, his conclusion that David was "not capable of

knowing and remembering those persons he wished to leave his property to," [59-2] ¶ 23, and all similar conclusions. The Liparis have failed to establish how a pharmacologist is capable of opining on a specific person's capacity to dispose of property, and it is their burden to do so.

Some portions of Dr. Dajani's report are based on sufficient facts and within his expertise. For instance, it was within Dr. Dajani's expertise to make diagnoses that derived from observations of physical phenomena ongoing in David's body that do not themselves carry legal meaning. I do not exclude Dr. Dajani's conclusion that David had "decreased mental alertness and cognitive functions," [59-2] ¶ 8, was in "an impaired and altered mental state," [59-2] ¶ 14, and other similarly pharmacologically based opinions.

Sullivan and D'Agnolo argue that part of Dr. Dajani's report should be held inadmissible because the nursing staff at the hospital disagreed with Dr. Dajani's assessment. [70] at 9. *See also* [59-2] ¶ 11. At least according to Dr. Dajani's review of the records, the treating physicians disagreed with the nurses, too. *See* [59-2] ¶ 12. That said, the portion of Dr. Dajani's report that criticizes the nurses' records because the nurses' examination of David was "limited to the most basic basis of a person's abilities," [59-2] ¶ 11, seems speculative and the Liparis fail to explain how such criticism falls under the rubric of pharmacology.

In addition, Dr. Dajani must use reliable principles and methods when drawing his opinions and conclusions. My task is to determine "whether the testimony has been subjected to the scientific method," and I must rule out "subjective belief or

unsupported speculation." *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993).

Neither Dr. Dajani's report nor the Lipari children's brief explains whether his review of David's voice in phone calls is part of a reliable methodology to render a pharmacological opinion. *See* [59-2] at ¶ 22. The same can be said of Dr. Dajani's conclusion that David's signature indicates "diminished capacity." *Id.* There has been no showing that Dr. Dajani has specialized knowledge that would allow him to interpret David's handwriting, signature or voice. *See id.* As Sullivan and D'Agnolo point out, Dr. Dajani's opinions in that regard are not pharmacological. [70] at 10. As the proponents of expert evidence, the Lipari children bear the burden of establishing admissibility, and they have not provided the necessary analysis for this portion of Dajani's report. I disregard his interpretation of the October 6, 2015 phone call. *See* [59-2] at ¶ 22. In theory, the recordings themselves could be used by jurors to determine whether Sullivan overcame David's free will, but the jurors would not benefit from knowing Dr. Dajani's opinions on such matters. *See* [74].

Many of Dr. Dajani's remaining opinions have been subjected to the scientific method and represent neither his subjective beliefs nor his unsupported speculations. They are admissible. For instance, his conclusion that David's "progressive hepatic encephalopathy" led to "psychiatric changes" is supported by reference to a medical dictionary that has been found to provide reliable definitions of various ailments. *See Scholl, Inc. v. S. S. Kresge Co.*, 580 F.2d 244, 247 (7th Cir. 1978); [59-2] ¶¶ 4, 8, 10. He has a basis to provide definitions of ailments, *see, e.g.,* [59-2] ¶ 9 ("TLS is a

metabolic derangement"), and assessments of bodily processes and their effects, *see, e.g.,* [59-2] ¶ 15 (concluding that a patient with an impaired liver would likely experience the deleterious effects of a medication for longer periods of time than would a patient with a functioning liver). Dr. Dajani's experience and expertise are sufficient to form the basis of a reliable opinion on such easily-testable matters. He cites to various studies that are consistent with materials relied upon by people in his field. *See, e.g.,* [59-2] ¶ 9 ("TLS results from the rapid destruction of malignant cells . . . (Cairo and Bishop 2004, Ikeda 2016)").[10]

## B.     Intentional Interference with Expectancy

In order to establish that they are entitled to recover on their claim for intentional interference with an expectancy against both Sullivan and D'Agnolo, the Lipari children must show "(1) the existence of [their] expectancy; (2) that defendants intentionally interfered with [their] expectancy; (3) the interference involved conduct tortious in itself such as fraud, duress or undue influence . . . ; (4) that there is a reasonable certainty that the devise to plaintiff[s] would have been received but for defendants' interference . . . ; and (5) damages." *Nemeth v. Banhalmi*, 99 Ill.App.3d 493, 499 (1st Dist. 1981) (citations omitted).

The Lipari children's theory is that they had an expectancy in the proceeds of the Protective Life insurance policy, the money in the Edward Jones and University of Illinois accounts, and David's personal property, *see, e.g.,* [18] ¶¶ 112–114, 119, and

---

[10] There is one exception: Dr. Dajani cites no support for his conclusion that "high serum ammonia . . . likely significantly altered [David's] mental state." [59-2] ¶ 14. Accordingly, I find inadmissible (and disregard) that portion of Dr. Dajani's report.

that both Sullivan and D'Agnolo interfered with that expectancy either by exerting undue influence on David in order to force him to change the beneficiaries for his life insurance policy and Edward Jones and University of Illinois accounts, [59] at 5; [18] ¶ 95, by fraudulently representing that David desired to make those same changes, [59] at 3, [18] ¶ 95, or by converting David's personal property by possessing it in contravention to his inheritance plan. [59] at 3.

### 1. A Will Contest Would not Have Provided Adequate Relief

According to Sullivan and D'Agnolo, the Lipari children's claim for intentional interference with expectancy will not lie because "the remedy of a will contest is available and would provide the injured party with adequate relief." *In re Estate of Hoover*, 160 Ill.App.3d 964, 966 (1st Dist. 1987); *Robinson v. First State Bank of Monticello*, 97 Ill.2d 174, 186 (1983); [57] at 2–3.

A will contest would not provide adequate relief. David's will plays a minor role in the Lipari children's tortious interference claim, if it plays any role at all: the trust provided for the distribution of all of the financial, §§ 1.02; 5.01; 6.02, and tangible, § 9.01(g), property at issue in this case. Neither party even attached David's will, let alone pointed to some specific provision that might supersede or contradict the distributary scheme described in the trust. *See* [60] ¶ 30 (Sullivan and D'Agnolo admit that David's will names the trust as its sole beneficiary). And since a will contest would only allow the Lipari children to set aside David's will, *In re Estate of Ellis*, 236 Ill.2d 45, 51 (2009), ("[t]he object of a will contest proceeding is not to secure a personal judgment against an individual defendant but is a quasi in rem proceeding to set aside a will"), it would not allow the Lipari children to obtain recompense for

the funds they say were tortiously redirected to D'Agnolo. *See* [34] ¶ 102 (seeking damages including "diminution of the amount of amount [sic] of their expectancy, loss of use of their expectancy, attorney's fees, costs and other damages"); *In re Estate of Hoover,* 160 Ill.App.3d 964, 966 (1st Dist. 1987) (finding adequate relief where the plaintiff would receive through the will contest "all the relief that they could have received as actual damages in the tort action"). Neither *In re Estate of Hoover*, 160 Ill.App.3d at 966, nor *Robinson*, 97 Ill.2d at 186, bar the Lipari children's claims.[11]

2.    *The Lipari Children had an Expectancy in all of the Property at Issue.*

The Lipari children say that they have produced evidence tending to show that they had an expectation in the proceeds from the Protective Life insurance policy; the life insurance policies that named the trust as beneficiary would pay out to a trust estate meant (in part) to provide for the Lipari children. [59-1] §§ 1.02; 5.02; 6.01; 8.01; 8.05(e); 9.01(a)–(c). They say the same thing about the Edward Jones accounts (both of which named the "David M. Lipari Trust" as their sole beneficiary immediately prior to the last-minute changes, [60] ¶ 16), and David's personal

---

[11] Even if Sullivan and D'Agnolo had addressed the line of cases that discuss trust contests rather than will contests, *see, e.g., Pernod v. Am. Nat. Bank & Tr. Co. of Chicago,* 8 Ill.2d 16 (1956); 755 Ill. Comp. Stat. Ann. 5/8-1(f), their argument would fail for the same reason: setting aside the trust would not deliver to them the remedy they seek in their complaint. *In re Estate of Luccio*, 2012 IL App (1st) 121153, ¶ 23 (the remedy for a tortious interference with expectancy claim premised on the violation of the terms of a trust that received property via a will "is a personal judgment against the individual defendant, which may be a money judgment or the imposition of a constructive trust or equitable lien where the defendant wrongfully received the legacy," while the remedy for a trust contest is simply the "setting aside of the trust"). What the Lipari children really need is a process that allows them to set aside the change-of-beneficiary forms that were executed just prior to David's death. Their tortious interference claim provides an adequate process for achieving an equivalent result.

property (the trust agreement states that, following his death, all of David's personal property should have been divvied up amongst the children, § 9.02(g)).

Sullivan and D'Agnolo assert that, for purposes of a claim for interference with an expectancy, the "expectancy" can only arise from a will. *See* [70] at 2, (citing *In re Estate of Roeseler*, 287 Ill.App.3d 1003, 1021 (1st Dist. 1997)). While the expectancy in *In re Estate of Roeseler* happened to arise from a will, the case does not stand for the proposition that an expectancy can only arise from a will. Other cases recognize that a claim for intentional interference with an expectancy can lie where that expectancy derives from a "trust that receives a legacy from a will." *See In re Estate of Luccio*, 2012 IL App (1st) 121153, ¶ 31; *Cleland v. Cleland*, 2018 IL App (2d) 170949, ¶¶ 40–41, *appeal denied*, No. 124055, 2018 WL 6251973 (Ill. Nov. 28, 2018) (in the context of a claim for "tortious interference with inheritance expectancy," finding that an expectancy existed in funds distributed first via a pour-over will into a trust, even though tortious conduct at issue pertained to interference with a right to take pursuant to the trust and not the will). *See also In re Marriage of Velasquez*, 295 Ill.App.3d 350, 353 (3rd Dist. 1998) (in divorce proceedings, spouses can have "expectancies" in land trusts and insurance policies).

Even though neither side has identified Illinois law that determines the issue, I predict that the Illinois Supreme Court would hold that an "expectancy" arising from a trust can form the basis of a claim for intentional interference with an expectancy. Wills and trusts both contain a decedent's wishes and directions, they both may be contested under the Illinois Probate Act, *See* 755 ILCS 5/8–1, and such

a decision would further the goal of judicial economy by having all will and trust disputes resolved under the Probate Act. The caselaw has changed the term from "expectancy" to "inheritance expectancy" in cases where the will plays a less important role, suggesting a broader approach than would "testamentary expectancy." *Cleland v. Cleland*, 2018 IL App (2d) 170949, ¶ 40, *appeal denied*, No. 124055, 2018 WL 6251973 (Ill. Nov. 28, 2018). The Lipari children had an expectancy in the proceeds of the Protective Life insurance policy and the Edward Jones accounts that falls within the scope of their tort claim.

The Lipari children fail to establish, however, that they had an expectancy in the proceeds from the University of Illinois credit account. Immediately prior to D'Agnolo's actions, the University of Illinois account named no beneficiary. [60] ¶¶ 14–15. It is possible that the proceeds in that account would have been distributed in accordance with David's will, which named the David M. Lipari trust as its sole beneficiary. [60] ¶ 30. But the Lipari children have failed to produce evidence from which a reasonable jury could conclude such an expectancy existed; they have not produced a copy of David's will, or pointed to any other instrument that would have directed the funds from the University of Illinois account to the Lipari children. Sullivan and D'Agnolo are entitled to judgment as a matter of law on the Lipari

children's claim that they tortiously interfered with the Lipari children's expectancy in the proceeds of the University of Illinois credit account.

> 3. *There is Sufficient Circumstantial Evidence that D'Agnolo Interfered with the Lipari Children's Expectancy in the Edward Jones Account.*

The Lipari children need to prove that Sullivan and D'Agnolo's "interference" was itself "tortious." *Nemeth,* 99 Ill.App.3d at 499. In order to meet this element of their claim for an intentional interference with an expectancy, the Lipari children could "state a claim for fraud," *In re Estate of Mocny*, 257 Ill.App.3d 291, 298 (1st Dist. 1993), by showing "(1) a false representation of material facts as opposed to opinion; (2) made by one who knew or believed the representation to be untrue; (3) made to a party who had a right to rely on the representation and, in fact, did so; (4) made for the purpose of inducing the other party to act, or to refrain from acting; and (5) that led to injury to the person who relied upon it." *Trautman v. Knights of Columbus*, 121 Ill.App.3d 911, 914 (1st Dist. 1984). The elements must be stated with "specificity, particularity and certainty." *Id.*

Alternatively, the Lipari children could establish that Sullivan and D'Agnolo committed the tort of "undue influence." In *DeHart v. DeHart,* the Illinois Supreme Court reiterated that the tort of undue influence resists formulaic approach (2013 IL 114137, ¶ 27) (citations omitted) (internal quotations omitted):

> What constitutes undue influence cannot be defined by fixed words and will depend upon the circumstances of each case. The exercise of undue influence may be inferred in cases where the power of another has been so exercised upon the mind of the testator as to have induced him to make a devise or confer a benefit contrary to his deliberate judgment and reason . . . False or misleading representations concerning the character of another may be so connected with the execution of the will that the allegation that such

23

misrepresentations were made to the testator may present triable fact questions on the issue of undue influence.

One initial problem with the Lipari children's undue influence claim is that David's will is not at issue. *See* [70] at 2 (Sullivan and D'Agnolo claim that there was no tortious conduct because the Lipari children have not alleged that anyone "compelled [David] to change the disposition of his assets under his Will or his Trust"). The alleged changes were made to a life insurance policy and two bank account beneficiary agreements. All three are contracts, not wills. *See Hobbs v. Hartford Ins. Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005) ("[a]n insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies").

When someone improperly coerces someone into signing a contract, they commit the tort of "duress," not undue influence. Nowhere in their cross-complaint or in their response to the motion for summary judgment do the Lipari children assert that Sullivan or D'Agnolo committed the tort of "duress," or that a theory of undue influence can be used to invalidate a contract. *See* [18]; [59].

Yet in certain circumstances, Illinois courts have held that a theory of "undue influence" can be used to invalidate other types of contracts, *see, e.g., Bruzas v. Richardson*, 408 Ill.App.3d 98, 103 (1st Dist. 2011) (invalidating agreement to pay interest made between attorney and client); *Mees v. Steffey*, 310 Ill. 161, 166 (1923) (undue influence can invalidate the execution of a deed), and have acknowledged that it may be a proper basis for invalidating changes made to life insurance policies. *Matter of Denler's Estate*, 80 Ill.App.3d 1080, 1091 (3rd Dist. 1980); *Pingree v. Jones*,

80 Ill. 177, 180 (1875). *See also Handelsman v. Handelsman,* 366 Ill.App.3d 1122, 1130 (2nd Dist. 2006) ("will substitutes," which are defined to include "an arrangement respecting property or contract rights that is established during the donor's life, under which (1) the right to possession or enjoyment of the property or to a contractual payment shifts outside of probate to the donee at the donor's death; and (2) substantial lifetime rights of dominion, control, possession, or enjoyment are retained by the donor" are to be "construed according to the rules used to construe wills"). The Lipari children's claim cannot be dismissed just because David's will is not at issue; Illinois law is broad enough to encompass a claim that a life insurance policy should be invalidated because of undue influence. *See DeHart v. DeHart,* 2013 IL 114137, ¶ 27.

Sullivan and D'Agnolo point out that there is a dearth of direct evidence and conclude therefrom that there is "no evidence" of tortious conduct. [57] at 4. But circumstantial evidence can be enough to defeat a motion for summary judgment, especially where direct evidence is unavailable, *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005), and where the circumstantial evidence creates an "issue of credibility." *Boyd v. Wexler*, 275 F.3d 642, 645 (7th Cir. 2001). Both fraud and tortious interference may be (and are often best) proven by circumstantial evidence. *Gray v. Solomon*, 338 Ill. 433, 440 (1930) (fraud is "devious, often, and at all times intended to be hidden; and, if brought to light, it must usually be by the means of

presumptive or circumstantial evidence"); *In re Estate of Hoover*, 155 Ill. 2d 402, 411–12 (1993) ("[p]roof of undue influence may be wholly inferential and circumstantial").

There is circumstantial evidence that D'Agnolo committed the tort of fraud when she executed the change of beneficiary form for the Edward Jones accounts. D'Agnolo submitted the change of beneficiary form for the two Edward Jones accounts shortly before David's death, [60] ¶ 25; 26, the result of those changes was that D'Agnolo inherited the proceeds of the two accounts in place of the Lipari children, *id.*; the only testimony presented to confirm that David intended this change was that of D'Agnolo, *see* [57-4] 247:7–249:22; *see also* [57-2] 191:8–19 (Sullivan was not involved in the changes to the Edward Jones accounts), and David and his children enjoyed a close, loving relationship that was in conflict with David's last-minute move to disinherit them. [59-3] ¶¶ 3–4; [59-4] ¶¶ 3–4; [59-5] ¶¶ 3–4; [59-6] ¶¶ 3–4. In other words, D'Agnolo had a motive for making the change (she directly profited from it), and the opportunity to make the change (she and David spent a lot of time alone while David was arguably in a weakened state, [59-2]), and David had a reason to not make the change (he had a close relationship with his children, at least according to his children). Sullivan knew nothing about the changes to the Edward Jones accounts; she was not even in the room to monitor D'Agnolo and prevent her from making the (allegedly) fraudulent change, and cannot corroborate D'Agnolo's account. [57-2] 191:8–19. Lastly, D'Agnolo's primary explanation for making the change (that David told her to make it) is not entirely convincing; D'Agnolo offers no explanation as to why David also failed to mention the need to change the Minnesota Life insurance

policy, too, nor any explanation for why David dropped his concerns about Carol's medical care.

From this, a reasonable juror could conclude that all but the last of the elements of a claim for fraud have been met. *See Trautman v. Knights of Columbus*, 121 Ill.App.3d 911, 914 (1st Dist. 1984). D'Agnolo represented to Edward Jones that David desired to change the beneficiaries to his Edward Jones account; there is circumstantial evidence that such an assertion was untrue and that D'Agnolo knew it; Edward Jones had a right to rely on the change-of-beneficiary form and in fact did; and there is circumstantial evidence that D'Agnolo made the change in order to induce Edward Jones into acting.

As the elements are phrased in *Trautman,* the Lipari children cannot establish the final element; the Lipari children allege that they were the ones harmed by the fraud, not Edward Jones. 121 Ill.App.3d at 914. Other cases drop the requirement that the injury must be suffered by the person who relied on the statement when listing the elements. *See McCarter v. State Farm Mut. Auto. Ins. Co.,* 130 Ill.App.3d 97, 101 (3rd Dist. 1985) (stating that the fifth element of a fraud claim is simply, "damages"). In the context of a claim for an intentional interference with an expectancy, Illinois courts recognize that the damages from fraudulent conduct do not necessarily need to be suffered by the person who relied upon the misstatement. *See, e.g. DeHart v. DeHart,* 2012 IL App (3d) 090773, ¶ 33, *aff'd*, 2013 IL 114137 (recognizing potential claim for intentional interference of expectancy where testator's new wife fraudulently destroyed a copy of a will that would have delivered

assets to testator's son; the person who relied on the fraud was not the one who suffered the damages). Similarly, here, the Lipari children's claim for intentional interference with an expectancy would lie if they could show that Edward Jones relied on D'Agnolo's misstatements and delivered the proceeds of the accounts to D'Agnolo, at the Lipari children's expense. D'Agnolo is not entitled to judgment as a matter of law on the claim that she tortiously interfered with their expectancy in the proceeds of the Edward Jones account, insofar as that claim is based on the underlying tort of fraud.

Much of the same circumstantial evidence could be used to show that D'Agnolo's conduct amounted to undue influence. D'Agnolo had a motive and opportunity to exert an "improper urgency of persuasion of David," in such a way that "destroy[ed] [David's] freedom." *DeHart v. DeHart*, 2013 IL 114137, ¶ 27. In addition to that circumstantial evidence, David was on medication and may have been in a weakened state, unable to resist pressure from his fiancé or unable to understand the extent of the changes being made to his inheritance plan. *See* [60] ¶ 34; [59-2]. D'Agnolo is not entitled to judgment as a matter of law on the claim that she tortiously interfered with the Liparis' expectancy in the proceeds of the Edward Jones account, insofar as that claim is based on the underlying tort of undue influence.

4. *There is Insufficient Circumstantial Evidence to Support the Rest of the Lipari Children's Claims*

There is insufficient evidence in support of the Lipari children's claims that Sullivan interfered with the Edward Jones account at all—let alone that she did so tortiously. She neither prepared the change of beneficiary forms, [60] ¶ 25, nor signed

them, [60] ¶ 26, and presented testimony that she was not there when the forms were executed and does not know who filled them out, how they were filled out, or anything else about them. [57-2] 191:8–19. The Lipari children do not argue that Sullivan fraudulently induced (or unduly influenced) David into making the changes.

There is also insufficient circumstantial evidence to support the Lipari children's claims that D'Agnolo interfered with the Protective Life insurance policy in a way that was tortious. Sullivan, not D'Agnolo, prepared the forms. [60] ¶ 23. David, not D'Agnolo, purportedly signed them. [60] ¶ 24. The Lipari children have not alleged or argued that D'Agnolo caused this change to be made, whether by unduly influencing David or by fraudulently inducing either Sullivan or David into making the changes. They have also not produced sufficient circumstantial evidence to support such an allegation. And because I find that there is also insufficient evidence of the existence of a civil conspiracy (discussed below), Sullivan's actions cannot form the basis of D'Agnolo's liability.

The children's claim that Sullivan tortiously interfered with the Protective Life policy is even less convincing. Sullivan had no motive to interfere with that policy, as she would not inherit any of David's estate regardless of whether the last-minute changes were effective or not (or at least, if she did have such a motive, the Lipari children have neither argued that such a motive existed, nor produced any evidence suggesting such a motive existed). The circumstantial evidence is too weak to support a judgment in the Liparis' favor.

Similarly, there is insufficient circumstantial evidence in support of the theory that D'Agnolo and Sullivan committed the tort of conversion. It is true that they made an unsupervised visit to David's apartment, [57-2] 172:18–176:20, that the ensuing chain-of-custody for David's personal effects has many broken links, [60] ¶ 31; [57-4] 295:24–305:5; [57-2] 172:18-178:7; [57-1] at 10–15, and that, ultimately, the Lipari children claim that some of their property remains missing. [60] ¶ 31. But the Lipari children have failed to identify a single piece of property that they know is missing; their response to Sullivan and D'Agnolo's motion for summary judgment makes only vague assertions that are insufficient to meet their burden here.[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). (And, as explained below, the Lipari children's claim for conversion fails because they have neither alleged, nor produced evidence tending to show, that they refused a demand for the property allegedly converted.)

The rest of the Lipari children's arguments attempt to create a genuine dispute where none exists. For instance, both sides disagree about whether the evidence shows that David signed the change-of-beneficiary forms, [57] at 4–5; [59] n. 2, but the Lipari children fail to raise sufficient evidence to show that a reasonable jury could conclude in their favor at trial; they simply decline to admit that David signed the forms and leave it at that. *See, e.g.,* [60] ¶ 24. The Lipari children also make much of the tension between Sullivan's decision to rely on her durable power of attorney

---

[12] The agreement filed in *In the Matter of the Estate of David M. Lipari* does appear to establish that none of David's personal property remains outstanding—and suggests that the Lipari children may have trouble proving as much at trial—but also explicitly precludes using the agreement to establish that point here. [57-1] at 19.

and her decision to, nonetheless, claim that she also acted pursuant to David's purportedly lucid and informed instructions. [59] at 7. But Sullivan only relied on that form when making the change to the North American insurance policies, *see* [60] ¶ 21, and the proceeds from both of those policies have already been paid to the trust and are no longer at issue. [60] ¶ 22. The Lipari children have failed to produce sufficient evidence to raise a genuine dispute about whether any of the changes to the Protective Life insurance policy constituted tortious conduct. They also failed to produce sufficient evidence to raise a genuine dispute about whether Sullivan's conduct was tortious with regard to the Edward Jones and University of Illinois accounts. Sullivan and D'Agnolo are entitled to judgment as a matter of law on the Lipari children's claims with regard to Sullivan's and D'Agnolo's roles in the changes that were made to the Protective Life insurance policy, Sullivan's role in changing the beneficiaries to the Edward Jones, and both Sullivan and D'Agnolo's alleged role in the conversion of the Lipari children's property.

## C.    Civil Conspiracy

In order to prove their civil conspiracy claim, the Lipari children must show that Sullivan and D'Agnolo together, "by some concerted action," knowingly and intentionally reached an agreement to commit an "overt tortious or unlawful act" "for the purpose of accomplishing . . . an unlawful purpose or a lawful purpose by unlawful means." *Fritz v. Johnston*, 209 Ill.2d 302, 317 (2004); *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill.2d 102, 133 (1999).[13]

---

[13] Sullivan and D'Agnolo argue that no claim for conspiracy can lie because the Lipari children failed to prove any underlying tort claim that might form the basis for the

The Lipari children point out that civil conspiratorial liability is often established "from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Adcock v. Brakegate, Ltd.*, 164 Ill.2d at 54, 66 (1994).

While the Lipari children are right as a general matter, they still must have some evidence to support their contention that Sullivan and D'Agnolo "worked together." *See* [59] at 9–10. As Sullivan and D'Agnolo chronicle in their reply, most of the circumstantial evidence presented in support of the Lipari children's conspiracy claim does not even tend to suggest the existence of an agreement. [70] at 13–15. The rest is so weak that it could not support a reasonable jury finding in their favor. For instance, the fact that there were "insurance papers and [a] computer" in the hospital room with Sullivan and D'Agnolo, [57-2] 89:1–7; [57-4] 193:9–195:8, and the fact that the two of them (apparently) determined that those papers were not responsive to the Lipari children's discovery requests, [57-1] at 10–15, is at most circumstantial evidence that they had in their possession a few items that might have made it easier for them to reach an agreement. But it does not allow an inference that an agreement was reached. The taped recordings submitted and cited by the Lipari children, [74]; [59-7], document conversations between David, Sullivan and representatives from various insurance companies; they do not even mention D'Agnolo, let alone suggest that Sullivan and D'Agnolo were working together.

---

conspiracy. [57] at 6–7. But as discussed above, at least a few of the Lipari children's claims rest on sufficient circumstantial evidence from which a reasonable jury could conclude that tortious conduct occurred.

The Lipari children's most convincing evidence is their most basic: Sullivan and D'Agnolo both completed tasks necessary to change the way David's estate would be inherited, and D'Agnolo benefited from those changes. But this alone is neither "compelling" evidence that there was an agreement between Sullivan and D'Agnolo to disinherit John for D'Agnolo's benefit (and, apparently, for no additional benefit to Sullivan), nor is this evidence "inconsistent with any other rational conclusion," including the one Sullivan and D'Agnolo advance: that David wanted them to make the changes and that, naturally, they each undertook small tasks necessary to bring his wishes into effect. *See Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 641 F.2d 457, 463 (7th Cir. 1981) ("when the plaintiff . . . relies on circumstantial evidence alone, the inference of unlawful agreement rather than individual business judgment must be the compelling, if not exclusive, rational inference"). Sullivan and D'Agnolo's motion for summary judgment as to the Lipari children's cross-claim for civil conspiracy is granted.

### D. Conversion

To establish their conversion claim, the Lipari children must show that they "have an absolute and unconditional right to the immediate possession of the property." *Cirrincione v. Johnson*, 184 Ill.2d 109, 114 (1998).

Illinois courts hold that the beneficiary of a living trust does not have an absolute and unconditional right to the immediate possession of the funds held in the trust and, for that reason, is not able to bring a conversion suit on her individual behalf. *Weisberger v. Weisberger*, 2011 IL App (1st) 101557, ¶ 56. *See also Katz v.*

*Belmont Nat. Bank of Chicago,* 112 Ill.2d 64, 69 (1986). Similarly, here, the Lipari children do not have an immediate, absolute and unconditional right to the trust principal. The Lipari children were not even entitled to withdraw money from the trust directly into their own accounts until reaching the age of thirty-five—nearly ten years after David died. [59-1] § 9.05. The David M. Lipari Trust might have such a right but, because the trust holds the property, the beneficiaries cannot directly sue Sullivan or D'Agnolo for conversion. This applies to all of the Lipari children's conversion claims against Sullivan and D'Agnolo. *See* [57] at 10–11.

The Lipari children have also failed to marshal evidence in support of a conversion against Sullivan because they have not produced any evidence tending to suggest that Sullivan refused a demand to return the paintings. *Sehnert v. Koenig,* 99 Ill.App. 513, 513 (1st Dist. 1902) (where the defendant lawfully possesses the property in question, "a demand must be made before the action [for conversion] can be maintained"); *Owens-Illinois, Inc. v. Candle Man, Inc.,* 5 Ill.App.3d 350, 352 (1st Dist. 1972) (accord). To the contrary, the evidence suggests Sullivan obtained the paintings lawfully when she, as trustee, and D'Agnolo, as executrix, visited David's apartment in order to obtain his personal property as part of their initial effort to then distribute his property, and that, afterwards, Sullivan intended for the paintings and wood carving to be distributed to the Lipari children, *see* [57-2] 179:17–180:1; 181:14–17, but had not returned them yet. If the Liparis made a request, they have not identified it, and it is their burden to do so. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (the nonmoving party must "make a sufficient showing on an

essential element of her case with respect to which she has the burden of proof"). Sullivan and D'Agnolo's motion for summary judgment on the Lipari children's claims against both Sullivan and D'Agnolo for conversion is granted.[14]

### E.     Intentional Infliction of Emotional Distress

In order to state a claim for intentional infliction of emotional distress, the plaintiff must show three things (*Vance v. Chandler*, 231 Ill.App.3d 747, 751 (3rd Dist. 1992)):

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.

Only conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" qualifies as "truly extreme and outrageous." *Pub. Fin. Corp. v. Davis*, 66 Ill.2d 85, 89–90 (1976) ("liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities"); *Rudis v. Nat'l Coll. of Educ.*, 191 Ill.App.3d 1009, 1013 (1st Dist. 1989) ("Illinois courts have essentially restricted the tort of intentional infliction of emotional distress to those cases in which the defendant's conduct is so abusive and atrocious that it would cause severe emotional distress to a person of ordinary sensibilities"). Moreover, the

---

[14] As an aside, a conversion claim does not require that the defendant currently possess the property—just that, at some point, the defendant "wrongfully and without authorization assumed control" over the property. *Cirrincione v. Johnson*, 184 Ill.2d 109, 114 (1998). *See also Illinois Cent. R. Co. v. Parks*, 54 Ill. 294, 295 (1870) ("[w]hile the authorities are in conflict as to whether trover will lie where the carrier has lost the goods, we apprehend there is no question where there has been a misdelivery"); Restatement (Second) of Torts § 234 (1965); *Barrelett v. Bellgard*, 71 Ill. 280, 282 (1874) (nominal damages appropriate where property returned prior to trial).

emotional distress experienced must be severe. *Pub. Fin. Corp.*, 66 Ill.2d at 90 ("Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress . . . [t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it"). Although the question of whether a plaintiff will prevail on a claim for intentional infliction of emotional distress is "a quintessential question of fact to be resolved by the trier of fact," *Phillips v. Irons*, *No. 1-03-2992*, 2005 WL 4694579, at *5 (Ill. App. Ct. Feb. 22, 2005), Illinois courts also dismiss such claims on summary judgment, where appropriate. *See, e.g., Weston v. Advocate Christ Med. Ctr.*, 2016 IL App (1st) 150935-U, ¶ 21; *Schweihs v. Chase Home Fin.*, LLC, 2016 IL 120041, ¶ 61*, reh'g denied* (Mar. 27, 2017).

The Lipari children point to fifteen different instances of conduct that they assert support a claim for intentional infliction of emotional distress. [34] ¶ 143. Nine of them fail because, far from being "so extreme in degree, as to go beyond all possible bounds of decency," *Pub. Fin. Corp.*, 60 Ill.2d at 90, they describe actions that are administrative and consistent with ordinary family disputes in the aftermath of an unexpected death. *See* [34] ¶ 143(a)–(c) (changing beneficiary forms); ¶ 143(d) (converting or disposing of property while claiming legal right to do so); ¶ 143(e) (unnecessarily prolonging process Lipari children were forced to endure to obtain property, in undescribed ways); ¶ 143(l) (authorizing the release of a document having to do with property ownership with intent that such release would result in the denial or delay of payment to the Lipari children); ¶ 143(m) (refusing to provide

written declination of office of trustee for "extremely unreasonable" period of time); ¶ 143(n) (knowing revocation of declination of office of trustee); ¶ 143(o) (waste and mismanagement as independent executor of estate, overspending of trust proceeds for personal benefit, telling Lipari children that money would be taken from trust to pay for Lipari children's life insurance policies).

The other six—each having to do with David's sudden death and ensuing funeral—are closer to being "beyond all possible bounds of decency." *Pub. Fin. Corp.*, 60 Ill. 2d at 90. The three younger Lipari children (Carol, Mary and Paul) allege that Sullivan and/or D'Agnolo effectively prevented them from visiting their father while he lay dying in the hospital (and added to their distress by inviting them, then uninviting them, and then threatening to remove them by force if they tried to attend). [34] ¶ 143(f). All four Lipari children allege that both Sullivan and D'Agnolo told them that they could not attend their father's funeral and that if they tried they would be forcibly removed, *id.* ¶ 143(g)–(h), and that both Sullivan and D'Agnolo undertook efforts to make sure that the Lipari children would not learn about the location of their father's funeral or the cemetery where he was buried. *Id.* ¶ 143(i)–(k).

Sullivan and D'Agnolo's testimony paints a somewhat different picture. Apparently, David's own brother did not want the Lipari children to attend David's funeral. [57-4] 273:9-274:20. It is true that D'Agnolo testified that she refused subsequent requests to see and/or speak with David prior to his passing because she learned that, almost immediately after John left the hospital, proceedings had been

filed to freeze David's assets, *id.* 185:19–186:14, but she never admitted that she did so in retribution or out of malice. If D'Agnolo reasonably believed that she was protecting David or acting in accordance with the wishes of David's family members, her conduct would not be outrageous. *Graham v. Commonwealth Edison Co.*, 318 Ill.App.3d 736, 746 (1st Dist. 2000) ("[a] reasonable belief that his objective was legitimate . . . . is a substantial factor in evaluating the outrageousness of the conduct").

The Lipari children point to other testimony that they say undermines Sullivan and D'Agnolo's version of the events. For instance, they argue that David had a loving and devoted relationship with his adopted children. *See* [59] at 13; [59-3] ¶ 4; [59-4] ¶ 4; [59-5] ¶ 4; [59-6] ¶ 4. The Lipari children point out that D'Agnolo herself testified that David would reach out to the Lipari children as much as once a week, [57-4] 61:10–13, that David was a "devoted and loving father," *id.* at 148:8–11, and that David and John expressed love for each other during their final visit together. *Id.* 172:9–21.

But while this testimony casts doubt on Sullivan and D'Agnolo's version of the events and must be credited, it falls short of being sufficient to convince a reasonable jury that either D'Agnolo or Sullivan acted maliciously or outrageously. Even if the Lipari children suffered severe emotional harm, *see, e.g.,* [59-4] ¶¶ 9–14, and even if the causal connection between the alleged conduct and the alleged harm is obvious enough, *see* [59] at 14, there is simply not enough to conclude that the conduct was malicious or outrageous. The standard is high: "[i]t is not enough that defendant acted

with an intent which is tortious or even criminal . . . or even that his conduct has been characterized by malice or a degree of aggravation which would entitle plaintiff to punitive damages for another tort." *Sale v. Allstate Ins. Co.*, 126 Ill.App.3d 905, 918 (1984). Taking the evidence in the light most favorable to the Liparis, D'Agnolo's conduct did not cross this high threshold: it was sharp but orderly (she relied upon hired security officers rather than resorting to more emotionally fraught self-help) and in accordance with the wishes of at least one other member of David's immediate family. At most, Sullivan failed to intervene and prevent D'Agnolo from so acting. The Lipari children do not raise a genuine dispute about any of these points.

Similar arguments can be made of the claim that D'Agnolo and Sullivan acted recklessly. Even though "reckless conduct [] will support a cause of action" if "the actor knows severe emotional distress is certain or substantially certain to result," *Pub. Fin.*, 66 Ill.2d at 90, the Lipari children still must put forth evidence showing that Sullivan and/or D'Agnolo acted recklessly. The evidence that the Lipari children cite is either irrelevant or tends to show the opposite. *See* [57-4] 185:19–190:22 (D'Agnolo had a conversation with John's attorney following John's departure); 260:20–261:5, 273:9–274:3 (D'Agnolo consulted with her family and some members of David's family before deciding whether to allow the children to attend the funeral); 274:8–274:20; (D'Agnolo excluded the Lipari children from the funeral because they were estranged and because D'Agnolo did not want to allow them to "refocus" the service "onto whatever they decided they would want it focused on"); [57-2] 155:10–16 (Sullivan was thankful that David never found out that John was

trying to freeze his funds prior to dying). The Lipari children have failed to produce evidence sufficient to carry their burden at trial, and D'Agnolo and Sullivan are entitled to judgment as a matter of law on the emotional distress claims.

## IV.  Conclusion

Defendants D'Agnolo and Sullivan's motion for summary judgment on plaintiff's cross-claims, [56], is granted in part, denied in part. The Liparis' claim that D'Agnolo tortiously interfered with the proceeds of the Edward Jones account survives, insofar as that claim is based on the underlying torts of undue influence or fraud. Sullivan and D'Agnolo are entitled to judgment as a matter of law on all of the Lipari children's other claims.

ENTER:

Manish S. Shah
United States District Judge

Date:  December 17, 2018